**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward FORD, Robert Little, John Felix, Solomon Johnson, Phillip Usquiano, Marcus Thompson, E. Dene Armstrong, Defendants–Appellants.**

Nos. 77–2731, 77–2741, 77–2772, 77–2832, 77–2833, 77–2847 and 77–2907.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1980.

Decided Sept. 26, 1980.

Rehearing Denied Nov. 19, 1980.

L. E. Osborne, Jr., Michael J. Roberts, Fredman, Silverberg & Lewis, Frank V. Gregorcich, Joseph Milchen, Neal Pereira, Michael J. McCabe, San Diego, Cal., for defendants–appellants.

Thomas M. Coffin, Asst. U. S. Atty., argued, Michael H. Walsh, U. S. Atty., Thomas M. Coffin, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff–appellee.

Before WALLACE and KENNEDY, Circuit Judges, and LUCAS,* District Judge.

WALLACE, Circuit Judge:

Appellants were trustees of three trust funds established by collective bargaining agreements between the International Laborers Union, Local 89 of San Diego (Local 89) and various employer organizations. The trusts included (1) the San Diego County Construction Laborer's Pension Fund (pension trust), (2) the San Diego County Construction Laborer's Group Insurance Trust (health and welfare trust), and (3) the San Diego County Construction Laborer's Vacation Trust (vacation trust). All counts upon which appellants were convicted relate to schemes designed to enrich the trustees at the expense of the trusts. Appellants contend that the evidence presented at trial is insufficient to support their convictions and that various procedural errors require reversal.

This case is a companion of *United States v. Andreen*, 628 F.2d 1236, (9th Cir. 1980) (*Andreen*), wherein we reviewed the conviction of the trust attorney on four of the counts before us in this case. A detailed summary of background facts is set forth in *Andreen*. This opinion will state only those facts necessary to resolution of the appellants' contentions.

We will first review the sufficiency of the evidence presented at trial. We will then review appellants' alleged procedural errors. We reverse in part and affirm in part.

I.

A. *The Deferred Compensation Scheme*

The pension trust was organized in 1963 under the Taft-Hartley Act which requires that the trust be governed by an equal number of management and union trustees. 29 U.S.C. § 186(c)(5)(B). Seven trustees were chosen by management and seven trustees were chosen by the union. The trust provided monthly pension payments for retired employees of all employers who were party to collective bargaining agreements with Local 89. Employees acquired pension rights in the form of pension credits which were purchased for the employee by his employer. The employer would make a specified contribution to the pension trust for each hour worked by an employee, and after 1,200 hours of labor an employee acquired one pension credit. Once 15 pension credits were accumulated an employee was eligible to retire at age 55 and begin receiving monthly pension payments. The amount of these monthly payments was determined by multiplying the number of accumulated pension credits by a credit value set by the pension trustees.

As trustees, the appellants were employees of neither management nor the union, and thus were not entitled to pension cred-

---

* Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

its for service as trustees. The pension trust document did provide, however, that trustees could be compensated for their services and reimbursed for expenses. Thus, trustees received a set fee for attendance at each monthly meeting of the board of trustees.

Several times between the creation of the trust in 1963 and enactment of a deferred compensation plan in 1970, the pension trustees explored the possibility of obtaining pensions for themselves. Three times attorneys opined that the trustees could not legally obtain pensions. Nonetheless, the deferred compensation plan enacted by the trustees in 1970 provided retiring trustees with monthly "deferred compensation" payments for life, in amounts determined by the value of pension credits under the pension trust. Prior to issuance of the indictment, more than $150,000 was paid to retired trustees as "deferred compensation" and the pension trust was committed to pay an additional $2,000,000 in deferred compensation over the expected lives of the trustees.

Count 2 of the indictment charged Armstrong, Felix, and Ford with violating 18 U.S.C. section 664[1] by enacting and receiving payments from the deferred compensation plan, and charged Thompson, Johnson, Usquiano, and Little with aiding and abetting commission of the crime in violation of 18 U.S.C. section 2.[2] In *Andreen* we concluded that section 664 prohibits the use of trust money in an unauthorized manner or to an unauthorized extent, if that use is accompanied by criminal intent. 628 F.2d at 1241. We also concluded that this deferred compensation plan was an unauthorized and excessive use of pension trust money within the prohibition of section 664. At 1243. Having already determined that the deferred compensation scheme falls within the prohibition of section 664, we should affirm the Count 2 convictions of Armstrong, Felix, and Ford if we find sufficient evidence to support the conclusion that they acted with criminal intent.[3] Because the intent required for aiding and abetting a crime is essentially the same as the intent required for commission of that crime, we may also affirm the Count 2 convictions of Thompson, Johnson, Usquiano, and Little if we find sufficient evidence to support the conclusion that they acted to further the deferred compensation scheme with the same criminal intent. *Andreen, supra,* at 1248.

Criminal intent necessary for theft offenses such as those enumerated in section 664 exists when a defendant knowingly acts wrongfully to deprive another of property. *Morissette v. United States,* 342 U.S. 246, 275–76, 72 S.Ct. 240, 255–256, 96 L.Ed. 288 (1952); *United States v. Goad,* 490 F.2d 1158, 1166 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665

---

1. 18 U.S.C. section 664 states:

 Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined not more than $10,-000, or imprisoned not more than five years, or both.

 As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

2. 18 U.S.C. section 2(a) states:

 Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

3. In *Andreen* we reviewed a judgment of conviction rendered by the district court. In this case, all of the appellants except Thompson were tried by jury. As to those appellants the trial judge left to the jury the determination of whether or not the deferred compensation plan was authorized. The same facts which led to our conclusion in *Andreen* that the deferred compensation plan was unauthorized, here provide sufficient evidence for a rational jury to have concluded, beyond reasonable doubt, that the deferred compensation plan was unauthorized and within the prohibition of section 664.

(1974). The existence of such criminal intent is a question for the trier of fact. *Morissette v. United States, supra,* 342 U.S. at 274, 72 S.Ct. at 255. Usually, it cannot be proven directly, but must be inferred from circumstantial evidence. *United States v. Sullivan,* 498 F.2d 146, 150 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974); *Taylor v. United States,* 320 F.2d 843, 849 (9th Cir. 1963), *cert. denied,* 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964). Thus, we must determine whether the government produced sufficient circumstantial evidence to permit a rational trier of fact to conclude, beyond a reasonable doubt, that appellants acted with specific intent to deprive the trust beneficiaries of trust funds; that is, that appellants were sufficiently aware of the facts to know that they were acting wrongfully and contrary to the trust placed in them by the pension trust beneficiaries. *United States v. Belt,* 574 F.2d 1234, 1238 (5th Cir. 1978).[4] In doing so, we must view the evidence in the light most favorable to the government. *United States v. Santiago,* 528 F.2d 1130, 1132–33 (2nd Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Sullivan, supra,* 498 F.2d at 150–51.

■ Armstrong, Felix, Ford, and Thompson were intimately involved with the creation and perpetration of the deferred compensation scheme. The record indicates that Armstrong, Felix, and Ford were present when questions about the legality of trustee pensions were raised by attorneys asked to review them as possible means for trustee compensation, and Thompson recalled having heard an attorney's opinion that the trustees could not legally be granted a pension under the trust.[5] Nonetheless, all four of these trustees participated in (1) the meeting where the deferred compensation plan was enacted,[6] (2) a meeting where the plan was amended to provide trustees with widow benefits more generous than those offered to pension trust beneficiaries generally, (3) a meeting where the minimum retirement age—the age before which pension trust beneficiaries could not collect pension payments—was eliminated for trustees under the deferred compensation plan, and (4) a meeting where the financial report format was amended to prevent disclosure of trustee deferred compensation payments. Moreover, Armstrong, Felix, and Thompson were present when the trustees voted to give Brown, a retiring trustee, "deferred compensation" of $168 per month for the rest of his life, despite the fact that Brown had actually "deferred" only $40 in trustee meeting fees. Finally, the record shows that these trustees took full advantage of the scheme's lucrative benefits. Armstrong retired at the age of 34, began receiving monthly deferred compensation payments of $675, received $10,125 in deferred compensation payments before return of the indictment, and would have received $348,300 in deferred compensation over his life expectancy. Felix received deferred compensation payments of up to $510 per month as a retired trustee, received $19,655 before the indictment was returned, and stood to receive $117,575 during his life. Ford was receiving deferred

---

**4.** In *Andreen* we concluded that cases, such as *United States v. Belt,* 574 F.2d 1234 (5th Cir. 1978), *construing* 29 U.S.C. section 501, are applicable to section 664. At 1242.

**5.** Appellants contend that this evidence is irrelevant because they enacted a trustee deferred compensation plan, not a trustee pension plan. Without deciding the correct characterization of the plan, we conclude that appellants' knowledge that compensation methods nearly identical to their deferred compensation plan were illegal, is probative of their knowledge

and intent when enacting the deferred compensation plan.

**6.** Ford voted against creation of the deferred compensation plan. Later, however, he participated in meetings where the plan was amended to provide even more favorable benefits to the trustees, and following his retirement he accepted $9,000 in deferred compensation payments. Thus, his original vote does not overcome the inference of intent raised by his subsequent, willing participation in the scheme.

compensation payments of $600 per month, received $9000 before the indictment, and stood to receive $136,800 over his life expectancy. Thompson was still a trustee when the indictment was returned, but stood to receive $152,120 in lifetime deferred compensation payments had he retired when eligible.

From this evidence of active participation in the unauthorized deferred compensation scheme, a rational trier of fact could conclude, beyond reasonable doubt, that Armstrong, Felix, and Ford were sufficiently aware of the facts to know that they were acting wrongfully and contrary to the trust placed in them by the pension trust beneficiaries. Thus, we find sufficient evidence of criminal intent to affirm the Count 2 convictions of Armstrong, Felix, and Ford. From this evidence a rational trier of fact could also have concluded, beyond reasonable doubt, that Thompson "acted with criminal intent to further the crime or that his purpose was to take part in its commission." *Andreen, supra*, at 1245. Thus, we also find sufficient evidence to affirm the Count 2 conviction of Thompson for aiding and abetting violation of section 664.

Johnson was convicted under Count 2 of aiding and abetting commission of the deferred compensation crime. Although he was not a trustee when the deferred compensation plan was enacted, the record presents substantial circumstantial evidence from which the jury could infer criminal intent. Johnson, who was to become president of Local 89 and a trustee of the pension trust, was a guest at the trustee meeting where Brown was granted deferred compensation of $168 per month for life

after deferring only $40 in trustee meeting fees. Johnson subsequently became a trustee and attended (1) the meeting at which the deferred compensation plan was amended to provide widow benefits more generous than those offered to pension trust beneficiaries, (2) the meeting where the minimum retirement age was eliminated for trustees, and (3) the meeting where the financial report format was altered so as to conceal the amount of deferred compensation paid to retired trustees. Johnson also attended meetings where deferred compensation payments were approved for 11 retiring trustees, and stood himself to receive $79,200 in lifetime deferred compensation payments after his retirement. Moreover, evidence of Johnson's involvement in the creation of a union officer severance trust—another scheme to enrich trustees at the expense of union members—was admitted as probative of Johnson's intent.[7] We find all of this evidence sufficient for a rational trier of fact to conclude, beyond reasonable doubt, that Johnson knowingly and wrongfully acted to further the deferred compensation crime or to participate in its commission. We thus affirm his Count 2 conviction for aiding and abetting violation of section 664.[8]

Although Usquiano and Little were also convicted under Count 2 for aiding and abetting the violation of section 664, our review of the record has not found sufficient evidence to affirm their convictions. The most incriminating evidence against Usquiano was his participation, with Johnson and others, in the creation of a union severance trust separate from the deferred compensation plan.[9] Aside from this general indicator of bad intent, however, we find no evidence from which the jury could infer

---

**7.** Details of the severance trust are set forth in Section II. B. 1. of this Opinion, *infra*.

**8.** Johnson and Thompson contend that there was a fatal variance between the government's allegations in Count 2 and its proof of Count 2 at trial. However, not only do they fail to demonstrate that such a variance occurred, they also fail to contend that it resulted in any

surprise or prejudice to their defense. *See Riley v. United States*, 411 F.2d 1146, 1153 (9th Cir. 1969). "Immaterial and nonprejudicial variance does not constitute reversible error." *Id.*

**9.** See note 7, *supra*.

specific criminal intent as to the deferred compensation plan. Usquiano was not a trustee when the deferred compensation plan was conceived, enacted, or amended to provide more generous widow benefits and retirement provisions, nor was he a trustee when the lifetime annuity was given to Brown. After becoming a trustee, Usquiano's only involvement in the deferred compensation plan was his presence at meetings where deferred compensation was awarded to seven retiring trustees. However, award of those deferred compensation payments was made only upon recommendation of a deferred compensation committee on which Usquiano never served. The evidence produced by the government does not place Usquiano in any circumstance from which knowing participation in the formulation or furtherance of the deferred compensation plan can be inferred without reasonable doubt. Therefore, other evidence of general bad intent does not satisfy the specific intent requirement of section 664, and we must reverse Usquiano's Count 2 conviction for aiding and abetting violation of section 664.

Little's lack of involvement in the deferred compensation plan was similar. He was not a trustee when the plan was conceived, created, or amended to provide generous widow benefits, nor was he a trustee when the lifetime deferred compensation was given to Brown. Although he attended the meeting at which the mandatory retirement age was eliminated, it was only his second meeting as a trustee, and Little had never before served as a trustee or received trustee training. Little was present when deferred compensation was awarded to eight retiring trustees, but, like Usquiano, Little never served on the committee that recommended the deferred compensation awards. Moreover, Little was not involved in the union severance trust introduced against Usquiano and Johnson. We do not find sufficient circumstantial evidence from which a rational trier of fact could conclude, without reasonable doubt, that Little possessed criminal intent in relation to the deferred compensation plan. Accordingly, we reverse his Count 2 conviction.

## B. The Pension Credit Scheme

In addition to the deferred compensation plan, the appellants were convicted for violating section 664 by creation of a pension credit plan for trustees of the health and welfare trust and vacation trust. These trusts, like the pension trust, were established under the Taft–Hartley Act which requires equal management and union representation on the board of trustees. 29 U.S.C. § 186(c)(5)(B). The health and welfare trust provided insurance for employees covered by collective bargaining agreements with Local 89, and the vacation trust provided vacation benefits for these same employees. Under the pension credit plan, these trusts provided their trustees with a form of deferred compensation by purchasing pension credits from the pension trust and giving them to the trustees in lieu of regular meeting fees.

The pension credit plan was the basis of Counts 3, 6, and 8 of the indictment, all of which charged violations of section 664. Count 3 charged that Armstrong, Felix, Ford, Johnson, Usquiano, and Little unlawfully took pension credits from the pension trust, and charged Thompson with aiding and abetting. Count 6 charged Armstrong, Felix, and Ford with unlawfully taking pension trust money received as monthly payments under the illegally obtained pension credits, and charged Johnson, Thompson, Usquiano, and Little with aiding and abetting. Count 8 charged Armstrong, Felix, Ford, Usquiano, and Little with unlawfully taking money from the health and welfare trust to purchase the pension credits from the pension trust, and charged that Johnson and Thompson aided and abetted.

██ Armstrong, Felix, Ford, Thompson, and Johnson raise a number of complaints about their convictions under Counts 3, 6, and 8 which we decline to review. "This circuit follows the concurrent sentence doc-

trine under which the appellate court, as a matter of discretion, may decline to review a conviction under one count if a conviction under another count is affirmed and the sentences run concurrently and no adverse collateral legal consequences for the appellant[s] result from the additional conviction." *United States v. Martin*, 599 F.2d 880, 887 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979). Armstrong, Felix, Ford, Thompson, and Johnson each received sentences on Counts 3, 6, and 8 to run concurrently with their sentence on Count 2, which we have affirmed. We see no adverse collateral legal consequences that will result from our decision not to review their claims.[10]

Because we reversed their convictions in Count 2, we must still review the Counts 3, 6, and 8 convictions of Usquiano and Little. We will first examine the sufficiency of the evidence to support a conclusion that the pension credit plan violated section 664, and we will then review the evidence of Usquiano's and Little's criminal intent.

### 1. The Unauthorized Nature of the Pension Credit Scheme

Many of the pension trustees who participated in the creation of the deferred compensation plan also served as trustees to the health and welfare trust and vacation trust. In fact, more than half of the health and welfare trustees were also pension trustees. The health and welfare trustees met each month and received a $100 meeting fee under the trust document's provision for trustee compensation. The vacation trustees met once every two months and also received $100 for each meeting.

Approximately ten months after the pension trustees enacted the deferred compensation plan, trustees of the health and welfare trust began discussing the possibility of creating a similar plan for themselves. They devised a plan to provide each health and welfare trustee with two pension credits annually, in lieu of the monthly $100 meeting fee. These credits would be purchased from the pension trust by the health and welfare trust. Their plan also had a retroactivity provision which gave each trustee two pension credits for each year he had served as trustee prior to the pension credit plan's enactment. These credits were also purchased from the pension trust by the health and welfare trust. Although health and welfare trustees had been paid monthly meeting fees throughout the years covered by the retroactivity provision, the plan did not require trustees to refund those meeting fees in exchange for the retroactive pension credits. Moreover, those who had not served as trustees from the creation of the trust were permitted to purchase two pension credits for each year of the trust's existence prior to the time they became trustees. The price for these credits was the price in effect during the year for which they were purchased, a price significantly less than pension credit prices at the time of the plan's enactment. Regular beneficiaries were not permitted to purchase a pension credit, even at current prices, without working 1,200 hours in a job covered by the pension trust.

The pension credit plan was enacted by the health and welfare trustees on October 12, 1971. In attendance at that meeting were eight health and welfare trustees who were also pension trustees and who had participated in the November 23, 1970 enactment of the deferred compensation plan. Although the formal minutes describe the pension credit plan as a form of deferred compensation, the plan simply provided pensions for the health and welfare trustees. Eight participating pension trustees had been told previously that trustees could not receive pensions under the pension trust, and some concern over the legality of the pension credit plan is reflected in the trust administrator's handwritten minutes of the October 12 meeting: The minutes state that the plan was passed "subject to

10. See note 16, *infra*.

legal ramifications." The trust administrator also testified that an attorney present at the October 12 meeting called the pension credit plan "questionable," and accepted an assignment to research its legality. The attorney subsequently resigned his position with the trust before rendering an opinion as to the plan's legality, but the plan nonetheless went into effect and the trustees began accumulating pension credits.

On January 4, 1972, the trustees of the pension trust approved the pension credit plan and voted to accept payments from the health and welfare trust. At the same meeting the pension trustees also agreed to accept payments under an identical pension credit plan enacted by the vacation trust the following day, January 5, 1972, in an action ostensibly separate from the pension trustees approval of January 4, 1972. During the months that followed creation of the pension credit plan, $34,000 of health and welfare trust money was transferred to the pension trust as payment for retroactive pension credits. The transfers ceased when trust attorney Andreen determined that the pension credit plan was illegal and advised the trustees, on June 29, 1972, to discontinue it. The trustees complied with his advice and stopped purchasing new credits, but they did not surrender the retroactive pension credits that they had already acquired under the pension credit plan.

Before the indictment was returned, some of the trustees retired and collected a total of $184,464 in monthly pension payments. Had the payments not been stopped by the indictment, the trustees would have collected, by virtue of the credits obtained under the pension credit plan, an additional $3,000,000 in pension trust money. Armstrong alone, over the course of his expected lifetime, stood to gain $433,-440 in pension payments under the health and welfare trust and vacation trust pension credit plans.

▋ The jury was justified in determining that this conduct violated section 664 as charged in Counts 3 and 6.[11] As we stated in *Andreen*, the terminology of section 664 encompasses "the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent." At 1241. We further stated that "lack of authorization may be shown if the diversion [of trust funds or credits] is substantially inconsistent with the fiduciary purposes and objectives of the union funds or pension plan, as set forth by statutes, bylaws, charters, or trust documents which govern uses of the funds in question." *Id.* In this case, the district judge charged the jury with the responsibility of determining whether the pension credit plan was authorized. We conclude that the government produced sufficient evidence for a rational trier of fact to conclude, beyond a reasonable doubt, that the pension credit plan was an unauthorized appropriation of pension trust credits and money. When appellants, acting as pension trustees, gave themselves lucrative and unlawful pensions by accepting the purchase of pension credits at prices substantially lower than the prices they were then charging for pension credits, and by means not available to regular trust beneficiaries, their handling of trust funds was reasonably characterizable as unauthorized and excessive. The jury was also justified in concluding that the pension credit plan violated section 664 as charged in Count 8. It is reasonable to conclude, when trustees have been fully compensated for services, that the health and welfare trust document's authorization of trustee compensation does not authorize the expenditure of $34,000 to provide pension credits as compensation for those same services. Such an unauthorized taking of health and welfare

---

11. Because neither Usquiano nor Little raised the issue, we express no opinion about any overlap or multiplicity in Counts 3, 6, and 8.

trust money constitutes conversion within the meaning of section 664 as we interpreted that provision in *Andreen.*

Thus, we find sufficient evidence to support the conclusion that the pension credit plan violated the prohibition of section 664 as charged in Counts 3, 6, and 8. We must now review the evidence of criminal intent.

## 2. Usquiano's and Little's Criminal Intent

 Usquiano participated as a health and welfare trustee in the October 12, 1971 creation of the pension credit plan. Consequently, he received 18¾ pension credits which would have entitled him to $101,250 in pension payments over his life expectancy had the indictment not intervened. Usquiano also participated in meetings where monthly pension payments were approved for seven retiring trustees who had collected pension credits under the plan. In addition to this evidence of Usquiano's direct involvement in the pension credit plan, there is evidence of Usquiano's participation in the creation of a severance trust designed to enrich union officers at the expense of union members.[12] Moreover, Usquiano attended educational conferences where proper trustee compensation was discussed and where informative materials were given to or subsequently mailed to all attending trustees. From this evidence a rational trier of fact could infer, beyond a reasonable doubt, that Usquiano was sufficiently aware of the facts to know that his conduct was wrongful and contrary to the trust placed in him by the trust beneficiaries. We affirm his conviction on Counts 3, 6, and 8.[13]

---

**12.** See note 7, *supra.*

**13.** *Usquiano contends that, as a matter of law, the conduct with which he was charged did not violate 18 U.S.C. section 664. He relies upon the legislative history of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., which was enacted 12 years after section 664 and which specified fiduciary standards for trustees' compensation. From this he argues that Congress did not view excessive trustee compensation as prohibited by section 664. He also argues that the trust money taken by the trustees, though perhaps excessive, was "compensation" as authorized by the trust document, and that he cannot be convicted of a crime simply for taking compensation that was unreasonable because reasonableness is an unconstitutional standard for criminal statutes. See United States v. Cohen Grocery Co., 255 U.S. 81, 87–88, 41 S.Ct. 298, 299, 65 L.Ed. 516 (1921). Finally, Usquiano contends that section 664, as applied in this case, is unconstitutionally vague because a reasonable person or his attorney could not have predicted that appellants' conduct would later be adjudged a violation of section 664. See Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971) (per curiam). We disagree with each of these arguments.*

*As we stated in Andreen, the traditional terms of theft found in section 664 are to be given their accepted meaning. At 1241; see Woxberg v. United States, 329 F.2d 284 (9th Cir.), cert. denied, 379 U.S. 823, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964); Colella v. United States, 360 F.2d 792 (1st Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). Thus, sec-* tion 664's prohibition of willful conversion encompasses the trustees' use of trust money in an unauthorized manner or to an unauthorized extent. *Morissette v. United States,* 342 U.S. 246, 272–76, 72 S.Ct. 240, 254 256, 96 L.Ed. ·288 (1952); *United States v. Sullivan,* 498 F.2d 146, 150 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974); *United States v. Goad,* 490 F.2d 1158, 1165–66 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974). We need not look to the legislative history of ERISA to determine the coverage of language so clearly construed in case law.

The district judge correctly instructed the jury that Usquiano and the other appellants violated section 664 if their taking of trust money was unauthorized and with criminal intent. He left the determination of both elements to the jury. As we conclude in text, the government produced sufficient evidence to support the jury's verdict of guilt on the section 664 charges, with the exception of Usquiano's and Little's Count 2 convictions.

Finally, we reject Usquiano's contention that section 664, as applied to his conduct, was unconstitutionally vague. " 'The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' " *Palmer v. City of Euclid, supra,* 402 U.S. at 546, 91 S.Ct. at 1564 *quoting United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). As we have just stated, the meaning of section 664 has been clearly set forth in case law. It strains reason to contend that Usquiano and the other appellants did not know that the taking of more than $5,000,000 in trust funds was an unauthorized taking.

██ We also find the evidence sufficient to affirm Little's conviction on Counts 3, 6, and 8. Little knew that he had a duty to safeguard trust assets and money and that he could not take advantage of his trusteeship to profit personally. Nonetheless, he participated as a health and welfare trustee in the October 12, 1971 creation of the pension credit plan. Although Little claims that the retroactivity provisions of the pension credit plan were subsequently added without his approval, he personally availed himself of their benefits by purchasing retroactive credits at prices well below the then–prevailing credit price. Little acquired a total of 28 pension credits under the pension credit plan and would have been entitled to $272,160 in pension payments over his lifetime had the indictment not intervened. As a pension trustee, Little participated in the January 4, 1972 pension trust decision to accept health and welfare trust payments for retroactive pension credits. Moreover, Little knew that only trustees could participate in the plan and assumed that the pension trust beneficiaries were not told of its existence.

Little testified that he did not know that the pension payments were for life, did not calculate the financial windfall that he was obtaining by purchase of the pension credits, and did not know or believe that he was doing anything wrong. However, the credibility of a witness must be determined by the trier of fact. We cannot second–guess the jury's decision to disbelieve Little's testimony. Indeed, we are bound to view that testimony in the light most favorable to the government. As a result, we conclude that a rational jury could have inferred, beyond a. reasonable doubt, that Little possessed criminal intent when participating in the

pension credit plan. Accordingly, we affirm Little's conviction on Counts 3, 6, and 8.[14]

### C. *The Conspiracy To Violate Section 664*

Count 1 of the indictment charged appellants with conspiracy to embezzle union trust funds in violation of section 664 and the conspiracy statute, 18 U.S.C. § 371. This conspiracy charge encompassed the deferred compensation plan, the pension credit plan, free trustee physical examinations at Scripps Clinic charged in Count 9, and padded expense procedures charged in Count 10.

██ As we stated in *Andreen*, criminal conspiracy includes four elements: an illegal objective, an agreement between two or more people to accomplish that objective, one or more overt acts in furtherance of the agreement, and criminal intent. At 1248. We determined in *Andreen* that the first three elements are present in this case. *Id.* at 1248. Thus, to affirm the conspiracy convictions of appellants, we must satisfy the fourth element by finding sufficient evidence to support the trier of fact's conclusion that appellants knowingly participated in the agreement with criminal intent to accomplish the objective.

██ The essence of appellant's embezzlement schemes was agreement and concerted action. The deferred compensation plan, pension credit plan, Scripps physical examination policy, and padded expense policy were all officially enacted or approved by the board of trustees. The evidence presented against appellants on the substantive counts consisted primarily of attendance at meetings where embezzle-

---

Since "the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States,* 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945).

14. Little contends that the district court erred by denying his motion for judgment of acquittal, Fed.R.Crim.P. 29, and his motion for a new trial, Fed.R.Crim.P. 33. The grounds for both motions, insufficiency of evidence and misjoinder, are thoroughly considered in this opinion and the district court's denial does not require separate consideration.

ment plans were discussed, approved, or amended. Virtually none of the evidence involved actions of isolated trustees undertaken without the knowledge of the other trustees. Thus, the appellants knowingly agreed to act in concert. Moreover, the evidence reviewed in our discussion of the deferred compensation and pension credit schemes amply demonstrates that appellants acted with the criminal intent necessary for the crime of conspiracy, intent which is not less than that required for the underlying substantive offense. *United States v. Feola,* 420 U.S. 671, 686, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975).

█ That Usquiano and Little were acquitted in our review of Count 2 does not bar affirmance of their Court 1 conspiracy conviction. Defendants need not participate in every phase of a criminal conspiracy to be guilty of its commission. *United States v. Kearney,* 560 F.2d 1358, 1362 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). Thus, we affirm the Count 1 conviction of Armstrong, Felix, Ford, Thompson, Johnson, Usquiano, and Little.

D. *The Physical Examination and Excessive Expenses*

In December 1973 the trustees of the health and welfare trust voted to give themselves, and the trustees of the pension and vacation trusts, free physical examinations at the Scripps Clinic in San Diego. Such examinations were not permitted for regular beneficiaries of the trust and the total bill to the trust was $18,000. Armstrong, Ford, Johnson, Thompson, Usquiano, and Little were convicted under Count 9 for thereby violating section 664.

Throughout the period of 1970 to 1975 the trustees also engaged in the practice of giving themselves allegedly excessive travel and expense allowances for attendance at numerous education conferences. This practice was the basis of Count 10 under

which Armstrong, Felix, Ford, Johnson, Thompson, and Usquiano were convicted.

With the exception of Armstrong's conviction under Count 10, all of the appellants convicted on Counts 9 and 10 were given sentences to run concurrently with their sentences on Counts 1, 2, 3, 6, and 8. Because we see no adverse collateral legal consequences which will result from application of the concurrent sentence doctrine,[15] we exercise our discretion and decline to review the concurrently sentenced convictions on Counts 9 and 10. However, we must still review Armstrong's conviction under Count 10 for which he received a sentence of five years imprisonment to run consecutively with his five year sentence on Count 1.

█ We find abundant evidence to support the jury's conclusion that Armstrong was guilty of violating section 664 as charged in Count 10. The trust documents permitted reimbursement of trustee expenses incurred while performing trust duties. However, as reimbursement for attendance at education conferences, the board of trustees would grant themselves large sums of money and would keep any money not spent at the conference. Evidence in the record suggests that more than half of such expense allowances was excessive. For example, in 1970 several of the Local 89 trustees received $2,500 each to attend a conference in Hawaii while trustees from another San Diego trust attended the same conference for an average $570 per trustee. The record also indicates that it was not uncommon for retiring trustees to attend such educational conferences only days before their preannounced retirement, or for trustees to attend educational conferences dealing exclusively with Canadian trusts which were given by Canadian speakers. Over a four year period this expense practice cost the trusts $170,000 in payments to appellants and $435,000 in payments to all trustees and their staff. From

---

**15.** See note 16, *infra.*

this evidence a rational trier of fact could conclude, beyond a reasonable doubt, that the trustee expense practice was an unauthorized and excessive expenditure of trust funds for the benefit of the trustees, in violation of section 664.

Armstrong was as actively involved in the expense practice as any trustee. He attended both the Hawaii conference in 1970, for which the trustees were overpaid as much as $1,900, and a March 1972 conference where experts told trustees that it was illegal to keep excess expense money. He also received $2,500 for attending a conference in Bermuda on Canadian trusts. The record indicates that Armstrong received more than $30,000 in expense money for attendance at various conferences. We find this evidence sufficient for a trier of fact to conclude, without reasonable doubt, that Armstrong possessed criminal intent in connection with the trustee expense practice. We therefore affirm his conviction on Count 10.

### E. The Surrender of Control and Racketeering

Count 12 charged that the trustees surrendered control of the trusts to a corporation formed by Armstrong in exchange for lucrative directorships in the corporation. Armstrong, Johnson, Usquiano, and Little were convicted thereunder for violating 18 U.S.C. section 1954, which prohibits the offer or receipt of anything of value given to influence a trustee's management of a trust. Count 15 charged Armstrong with racketeering in violation of 18 U.S.C. section 1962(c), and he was convicted when the jury concluded that he had conducted the trust in a pattern of racketeering activity.

Johnson, Usquiano, and Little received sentences on Count 12 to run concurrently with their sentences for violation of section 664. Armstrong received a sentence on Count 12 to run concurrently with his sentence on Count 2, and received a sentence on Count 15 to run concurrently with his consecutive sentences on Counts 1 and 10. Because we have affirmed section 664 convictions of Johnson, Usquiano, and Little, and have affirmed Armstrong's convictions on Counts 1, 2, and 10, we discretionally decline to review the convictions under Counts 12 and 15. We see no adverse collateral legal consequences which will result from this application of the concurrent sentence doctrine.[16]

### F. Summary

To summarize, we find sufficient evidence to affirm the convictions of Felix, Ford, Thompson, and Johnson on Counts 1 and 2; Armstrong on Counts 1, 2, and 10; and Usquiano and Little on Counts 1, 3, 6, and 8. We find insufficient evidence to affirm, and therefore we reverse, the convictions of Usquiano and Little on Count 2. By application of the concurrent sentence doctrine we decline to review the remaining counts. We must next consider the alleged procedural errors relevant to the counts we have reviewed.

### II.

### A. Misjoinder

 Felix, Ford, and Little contend that the section 664 counts (Counts 1–10)

---

16. It is well settled that we may, in the interest of judicial economy, decline to review a conviction when its sentence runs concurrently with another conviction which we have affirmed and no adverse collateral legal consequences will result. *See, e. g., United States v. Martin,* 599 F.2d 880, 887 (9th Cir.), *cert. denied sub nom,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *United States v. Young Buffalo,* 591 F.2d 506, 512–13 (9th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Diaz–Alvarado,* 587 F.2d 1002, 1005 (9th Cir. 1978), *cert. denied sub nom,* 440 U.S. 927, 99 S.Ct. 1261, 59 L.Ed.2d 482 (1979); *United States v. Walls,* 577 F.2d 690, 699 (9th Cir.), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978). We see no adverse collateral legal consequences in this case. The adverse legal effects that attend felony convictions will arise from our affirmance of the section 664 counts, regardless of any decision we would make on the counts we decline to review.

should not have been joined with the section 1954 counts (Counts 11 and 12) and with the section 1962(c) count (Count 15).[17] They contend that we must reverse their convictions because prejudice is presumed when counts have been misjoined.

■ Joinder of charges against multiple defendants is governed by Federal Rule of Criminal Procedure 8(b). *United States v. Satterfield,* 548 F.2d 1341, 1344 (9th Cir. 1977), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978); *United States v. Roselli,* 432 F.2d 879, 898 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). Rule 8(b) provides:

> Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Joinder of multiple defendants is proper "only if all of the offenses charged in the indictment arose out of the same series of transactions." *United States v. Satterfield, supra,* 548 F.2d at 1344. *See United States v. Martin,* 567 F.d 849, 853 (9th Cir.1977); *Metheany v. United States,* 365 F.2d 90, 94 n.4 (9th Cir.1966), *cert. denied,* 393 U.S. 824, 89 S.Ct. 81, 21 L.Ed.2d 94 (1968); *Williamson v. United States,* 310 F.2d 192, 197 n.16 (9th Cir.1962). Therefore, to conclude that joinder was proper in this case, we must determine that Counts 11, 12, and 15 arose out of the same series of acts or transactions as Counts 1–10.

■ Count 15 clearly satisfies this Rule 8(b) requirement. The gravamen of the racketeering charge was that Armstrong, in his conduct of the trusts, committed two or more section 664 substantive offenses. It was the very conduct charged in Counts 1–10 that formed the basis for Count 15. Therefore, they all arose from the same transactions.

Joinder of Counts 11 and 12 presents a more difficult problem. They charge that the trustees accepted lucrative directorships as a bribe to surrender control of the trusts to Armstrong and his corporation. This is not the conduct charged in Counts 1–10. However, proper joinder under Rule 8(b) is not limited to counts that arise from the same acts or transactions; joinder is also proper when the counts arise from the same series of acts or transactions.

■ In considering whether a particular set of events constitutes a "series of acts or transactions," we have stated that "transactions" has a flexible meaning and that the existence of a "series" depends upon the degree to which the events are related.

17. Counts 4, 5, and 7 were severed before trial. Little nonetheless contends that these counts were effectively misjoined because they were left in the indictment that was read to the jury and taken to the jury room.

As appellants themselves contend, the prejudice of misjoinder is the evidence that is admitted to prove the counts misjoined. Despite Little's contention to the contrary, our review of the record reveals that no appreciable amount of evidence was received as to any of these counts. Therefore, even if it was error to leave the counts in the indictment, a question which we do not decide, such error was harmless. *See United States v. Martin,* 567 F.2d 849, 854 (9th Cir.1977); *United States v. Friedman,* 445 F.2d 1076, 1083 (9th Cir.), *cert. denied sub nom,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971).

Little also contends that Counts 13 and 14, although severed by the trial judge, were effectively misjoined when evidence concerning the severance trust was admitted as a prior act relevant to the trustees' intent. We disagree. Ordinarily, evidence admitted as a prior bad act is significantly less extensive, and therefore usually less damaging, than evidence admitted for proof of crime. *United States v. Satterfield,* 548 F.2d 1341, 1346 (9th Cir.1977), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). Admission of severance trust evidence may properly be challenged on evidentiary grounds, but not on the basis of misjoinder. Counts 13 and 14 were not misjoined. They were severed. The admissibility of the severance trust evidence is considered in Section II. B. 1. of this Opinion.

*United States v. Satterfield, supra,* 548 F.2d at 1344; *United States v. Friedman,* 445 F.2d 1076, 1083 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). Mere factual similarity of events will not suffice. *United States v. Adams,* 581 F.2d 193, 197 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Satterfield, supra,* 548 F.2d at 1344–45; *United States v. Roselli, supra,* 432 F.2d at 898. Rather, there must be some greater "logical relationship" between the occurrences. *United States v. Satterfield, supra,* 548 F.2d at 1344; *United States v. Friedman, supra,* 445 F.2d at 1083.[18] Such a logical relationship may be shown by the existence of a common plan, scheme, or conspiracy. *United States v. Adams, supra,* 581 F.2d at 197; *United States v. Kennedy,* 564 F.2d 1329, 1333 (9th Cir. 1977), *cert. denied sub nom* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); 8 Moore's Federal Practice ¶ 8.06[2] at 8–37. However, the plan, scheme, or conspiracy need not be charged on the face of the indictment. "This court has taken a pragmatic approach to problems of joinder. 'Although Rule 8(b) standards are stated in terms of required allegations, a conviction will not be reversed on appeal if the evidence at trial establishes that joinder was proper . . . .'" *United States v. Martin, supra,* 567 F.2d at 853, *quoting United States v. Roselli, supra,* 432 F.2d at 899 n.33.

 We conclude that the trustees' acceptance of potentially lucrative directorships in exchange for surrendering control of the trusts, and their enactment of the deferred compensation plan, pension credit plan, Scripps physical examination policy, and travel expense policy, were all part of an ongoing scheme to enrich the trustees at the expense of the trusts sufficient to constitute a series of acts or transactions within the meaning of Rule 8(b). The various trustee actions formed a consistent pattern: trustee discussion and enactment of plans or policies contrary to law, trust documents, and/or fiduciary duties, which were financially lucrative to the trustees themselves. That the acts or transactions were spread over a period of years does not mean that there was no series. More than ten of the overt acts charged in the Count 1 conspiracy occurred after the trustees' December 30, 1974 surrender of trust control to Armstrong and his corporation. Moreover, during the formulation of the alleged trustee bribery charged in Counts 11 and 12, the trustees were continuing to grant themselves excessive amounts of money for conference attendance.

"Rule 8(b)'s 'goal of maximum trial convenience consistent with minimum prejudice' is best served by permitting initial joinder of charges against multiple defendants whenever the common activity constitutes a substantial portion of the proof of the joined charges." *United States v. Roselli, supra,* 432 F.2d at 899 (footnote omitted), *quoting,* 8 Moore's Federal Practice ¶ 8.06[2] at 8–36. In this case, evidence submitted to prove Counts 1–10 was also relevant to Counts 11 and 12. It not only established the context of the bribery scheme so as to make it understandable, but was probative of the trustees' intent in surrendering control to Armstrong's corporation. *Cf. United States v. Barney,* 568 F.2d 134, 135 (9th Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (per curiam) (joinder proper under Rule 8(b) because perjury evidence relevant to stolen vehicle charge).[19]

---

18. *United States v. Satterfield, supra,* 548 F.2d 1341 did *not* reject the "logical relationship" test as Felix and Little contend. On the contrary, it recognized the validity of that test. *Id.* at 1344. In *Satterfield* we simply concluded that factual similarities in violations of the same statutory provision did not make the set of occurrences in that case a "series of acts or transactions." *Id.* at 1344–45.

19. The district judge permitted joinder of Counts 11 and 12 for these very reasons. He stated:

Counts 11 and 12 are . . . logically related to the case as a whole and properly

That Felix, Ford, and Little retired prior to the trustees' surrender of control does not alter our conclusion that Counts 11 and 12 arose from the same series of acts or transactions as Counts 1–10, and were therefore properly joined under Rule 8(b). "It is implicit in the language of Rule 8(b) that so long as all defendants participate in a series of acts constituting an offense or offenses, the offenses and defendants may be joined even though not all defendants participated in every act constituting each joined offense." *United States v. Roselli, supra,* 432 F.2d at 899 (footnote omitted); *see United States v. Kennedy, supra,* 564 F.2d at 1333–34. *Cf. United States v. McDonald,* 576 F.2d 1350, 1356 (9th Cir.), *cert. denied sub nom,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978) (that defendants entered and left the operation at various times did not create fatal variance rendering the joint trial improper).[20]

We conclude that the district judge did not err in permitting joinder of Counts 11, 12, and 15. This conclusion comports with our stated policy that Rule 8(b) should be construed broadly in favor of initial joinder. *United States v. Satterfield, supra,* 548 F.2d at 1344; *United States v. Friedman, supra,* 445 F.2d at 1082.

Ford and Little also contend that the district judge erred by refusing to grant their motion made under Federal Rule of Criminal Procedure 14, to sever Counts 11, 12, and 15 from Counts 1–10. Rule 14 states:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indict-ment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Thus, severance is proper under Rule 14 only if the defendant shows that the joinder prejudiced his defense. "Some prejudice necessarily inheres when defendants are joined for trial. However, '[i]f all that was necessary to avoid a joint trial were a showing of prejudice, there would be few, if any, multiple defendant trials.'" *United States v. McDonald, supra,* 576 F.2d at 1355, *quoting,* 8 Moore's Federal Practice ¶ 14.04[1], at 14–14.1 (1977). "Appellants carry the difficult burden of demonstrating *undue* prejudice resulting from a joint trial, and we will reverse the trial court only in those rare instances where the refusal to sever amounts to an abuse of discretion." *United States v. McDonald, supra,* 576 F.2d at 1355 (emphasis added). *See United States v. Adams, supra,* 581 F.2d at 197; *United States v. Kennedy, supra,* 564 F.2d at 1334; *United States v. Patterson,* 455 F.2d 264, 266 (9th Cir.1972); *United States v. Roselli, supra,* 432 F.2d at 901. To satisfy this heavy burden, an appellant must show that the joint trial was so prejudicial as to require the exercise of the district judge's discretion in only one way: by ordering a separate trial. *United States v. Adams, supra,* 581 F.2d at 198; *United States v. Ragghianti,* 527 F.2d 586, 587 (9th Cir.1975); *Parker v. United States,* 404 F.2d 1193, 1194 (9th Cir.1968), *cert. denied,* 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969).

Ford and Little have failed to meet their burden of proving undue prejudice. The evidence related to Counts 11 and 12

joined under Rule 8(b). According to the government's theory of the case, the creation of [Armstrong's corporation] was the culmination of defendants' efforts to loot the trust funds and its creation can only be understood in the context of the earlier efforts. Once again severance would serve no practical purpose; in order for the government to explain the creation of [Armstrong's corporation] and the illegality associated with it, it will have to delve into all the matters included in Counts 1 through 10.

20. We have recognized that this may lead to joint trials such as this one where evidence was introduced against one defendant and not against a co-defendant. *See United States v. Roselli,* 432 F.2d 879, 900 n.38 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

comprised a relatively small portion of the evidence submitted at trial. The evidence of Count 15 was virtually the same evidence introduced to prove Counts 1–10. Moreover, throughout the trial the district judge carefully instructed the jury as to the limited admissibility of any evidence that did not apply to all of the defendants or all of the counts. Where the district judge has instructed the jury as to the admissibility of evidence and the appellants have failed to show an inability on the part of the jury to compartmentalize the evidence as it relates to each defendant, we have affirmed the trial court's refusal to sever. *United States v. Adams, supra*, 581 F.2d at 198; *United States v. McDonald, supra*, 576 F.2d at 1356 & n.8; *United States v. Kennedy, supra*, 564 F.2d at 1334; *United States v. Patterson, supra*, 455 F.2d at 266–67. We cannot say that the district judge abused his discretion under Rule 14 by denying Ford's and Little's request to sever Counts 11, 12, and 15.

## B. *Evidentiary Issues*

### 1. Severance Trust Evidence

Several of the appellants were initially charged under Counts 13 and 14 of the indictment with the creation of a severance trust to benefit union officers at the expense of union members. Although Counts 13 and 14 were severed from the case by the district judge, evidence of the severance trust was subsequently admitted as a similar act, probative of intent. All of the appellants contend that admission of the severance trust evidence was reversible error. We disagree.

Local 89's constitution states that union officers may not increase their compensation without giving advance notice to and obtaining the approval of union members. It also states that union officers may not expend large sums of money without membership approval. Nonetheless, Local 89's executive board, which included Armstrong, Thompson, Johnson, and Usquiano, created a severance trust to provide a lump sum severance payment to union officers who retired or were voted out of office. The trust was to be funded by a $25 contribution from each new union member, extracted as part of the $150 union initial fee.

Membership approval of the trust was purportedly obtained when 60 paragraphs of executive board minutes were approved by consensus at a union meeting. The 58th paragraph contained a passing reference to the severance trust which reported its creation and method of funding. This reference did not explain the trust purpose or beneficiaries, nor did it explain how much money the trust would amass and expend.[21]

During the first three years of its existence, the severance trust accumulated $180,000 from union initiates. More than $30,000 was paid to three retiring officers, and an additional $40,000 was earmarked for three officers soon to retire. The union members were never informed of these severance payments, and there is little doubt that they would have objected had they known. Indeed, in a union meeting that preceded creation of the severance trust, union members moved that the retiring president of Local 89 be given a farewell gift, but specified that it not exceed $500.

Although the district judge severed the counts arising from the severance trust, and initially refused to admit evidence of its creation, he subsequently admitted the evidence as probative of some of the appellants intent in creation of the deferred compensation and pension credit plans. Because the union executive board did not consult an attorney when creating the severance trust, the district judge also admitted the evidence as relevant to several of the appellants' defense that their approval of questionable plans, such as the deferred

---

**21.** The full reference stated:

"It was moved to establish a Severance Pay Trust Fund to be trusteed by the Executive Board and financed from the $25.00 out of each new application for membership. Motion carried."

compensation and pension credit plans, was always based upon the trust attorney's assurance that the plans were lawful.

Prior similar acts, although not admissible to show general criminal propensity, are admissible to prove criminal intent. *Andresen v. Maryland*, 427 U.S. 463, 483, 96 S.Ct. 2737, 2749, 49 L.Ed.2d 627 (1976); Fed.R.Evid. 404(b); ·2 Wigmore on Evidence § 302 at 200 (1940). We have stated that this rule is one of inclusion which admits evidence of other crimes except where that evidence tends to prove only criminal disposition. *United States v. Herrell*, 588 F.2d 711, 714 (9th Cir. 1978), *cert. denied*, 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1979); *United States v. Rocha*, 553 F.2d 615, 616 (9th Cir. 1977) (per curiam); *United States v. Riggins*, 539 F.2d 682, 683 (9th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 749, 50 L.Ed.2d 758 (1977) (per curiam). *See also* 2 Weinstein's Evidence § 404[08] (1979). In *United States v. Brashier*, 548 F.2d 1315 (9th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977), we established a three–step test for reviewing the admissibility of prior acts:

Evidence of prior acts is admissible to demonstrate a defendant's criminal intent if (1) the prior act is similar and close enough in time to be relevant, (2) the evidence of the prior act is clear and convincing and (3) the trial court determines that the probative value of the evidence outweighs any potential prejudice.

*Id.* at 1325. These determinations rest within the trial judge's discretion, and we will reverse his admission of prior act evidence only for a clear abuse of that discretion. *United States v. Herrera–Medina*, 609 F.2d 376, 379 (9th Cir. 1979); *United States v. Herrell, supra*, 588 F.2d at 714; *United States v. Rocha, supra*, 553 F.2d at 616.

We conclude that the severance trust was sufficiently similar to the deferred compensation and pension credit schemes to be probative of Armstrong's, Felix's, Thompson's, Johnson's, and Usquiano's criminal intent. Like the deferred compensation and pension credit plans, it was a form of post–retirement compensation, enacted by these appellants in their capacity as fiduciaries, for their personal benefit, and at the expense of those whose funds they were supposed to be safeguarding. Just as enactment of the deferred compensation and pension credit plans breached readily apparent legal limits on trustee pension compensation, creation of the severance trust breached readily apparent union constitutional limits on officer compensation and expenditure of union funds.[22] Moreover, the severance trust was created within a year of the deferred com-

---

**22.** Armstrong contends that the district judge usurped the fact-finding function of the jury by instructing that severance pay was compensation within the meaning of the union constitution. If this was error, it was harmless. In addition to requiring member ratification of increases in union officer compensation, the constitution required that members ratify all expenditures of "large sums of money." Thus, regardless of whether the severance payments were considered "compensation," membership approval was required. It is true that the constitutional ratification procedures for compensation increases were more stringent, and therefore more likely to have been violated by the union trustees, than the ratification procedures for expenditures of large sums of money. But under either constitutional provision the ratification procedure used was questionably obscure. Thus, we do not believe that the

district judge's characterization of the severance trust altered the jury's perception of its propriety.

Moreover, the probative nature of the severance trust evidence did not turn upon whether the trustees technically violated the union constitution. Rather, it was the similarity of the severance trust plan to the deferred compensation and pension credit plans which was probative of the trustees' intent. Compensation or not, the severance trust was approved by questionable procedures, allocated large sums of money for the union officers' personal use, and did so in ways similar and close in time to the other embezzlement schemes. After characterizing the trust as compensation the district judge instructed the jury: "The state of mind of each of the participants or recipient with respect to the character of the severance trust is a question of fact for you and you alone to

pensation plan, and during the same month that the pension trustees were accepting the health and welfare trust plan to purchase pension credits for themselves as health and welfare trustees.[23]

Creation of the severance trust, the questionable method of its ratification, and the amount of money amassed and expended by it, were clearly and convincingly proven. The government introduced the union constitution and the minutes of the meeting at which the severance trust was created, and elicited the remaining details from the appellants on cross–examination. Appellants do not challenge the clarity with which the severance trust was proven.

Finally, evidence of the severance trust was clearly probative of appellants' criminal intent. It undercut their assertions of innocence and rebutted the claim that they took no questionable actions without the approval of legal counsel. Any prejudice arising from introduction of the severance trust evidence was outweighed by its relevance to the key issue at trial. Moreover, the trial judge carefully instructed the jury as to its limited admissibility. *See United States v. Rocha, supra,* 553 F.2d at 616; *United States v. Brashier, supra,* 548 F.2d at 1326. We conclude that the district judge did not abuse his discretion by admitting the severance trust evidence.[24]

**2. Haning Disability Pension Evidence**

■ When John Haning, a management trustee, resigned his trusteeship at the age of 49, he did not have enough pension credits to begin collecting monthly payments until he was 55 years old. To avoid six years without a pension, Haning falsified a work history with a San Diego masonry company, obtained a doctor's certification that he was physically disabled from doing masonry work, and submitted a false disability claim to the pension trust. Haning thereby began collecting disability pension payments of $630 per month while earning $49,000 a year as vice president of a steel company.

As proof of Armstrong's criminal intent, the district judge admitted evidence that Armstrong filled out the false disability form for Haning. Armstrong contends that his participation in the Haning fraud is not relevant to his intent in the deferred compensation plan and other embezzlement schemes, and that its admission constitutes reversible error.[25]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Armstrong did not attempt to refute his participation in the various embezzlement schemes charged at trial. Rather, he claimed that he did not know he was acting improperly and did not wrongfully intend to take money belonging to others. That Armstrong

---

determine." Thus, we conclude that if there was error, it did not substantially sway the jury in consideration of the evidence. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–1248, 90 L.Ed. 1557 (1946).

**23.** Felix contends that the severance trust evidence was improperly admitted against him because he was not involved with its creation. However, the record shows that Felix, as an executive board member, was aware of the trust's creation, objected to the fact that it was designed to use union members' initiation fees to enrich union officers, and yet accepted an $1,800 payment from the trust at the time he retired. That Felix knew of the trust's creation and method of operation, and willingly became one of its beneficiaries, is probative of his intent as to the other post–retirement compensation schemes. Moreover, our review of the record indicates that the district judge carefully limited all evidence not applicable to Felix.

**24.** Little and Ford also complained about admission of the severance trust evidence. But as management trustees, the severance trust evidence was not admitted as to them, and the district court so instructed. *See United States v. Brashier,* 548 F.2d 1315, 1326 (9th Cir. 1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977).

**25.** Armstrong's counsel expressly stated at trial that he was not objecting to admission of the Haning fraud on prejudice grounds, but was objecting because it was not relevant. He adheres to that position before us.

assisted a former trustee in the fraudulent taking of money from the pension fund, and did so at approximately the same time as the other embezzlement schemes were being perpetrated, tends to make the existence of his criminal intent more probable than it would be without such evidence. Thus, Armstrong's involvement in the Haning fraud was relevant to his criminal intent, and the district judge did not abuse his discretion by admitting it.

### 3. Other Evidence

Appellants claim that the district judge erred by admitting the following items of evidence: (1) the AFL–CIO Code of Ethics which prohibits union officers from accepting compensation for work as trustees; (2) annual textbooks summarizing lectures on proper expense practices; (3) various brochures mailed to the trusts and individual trustees, advertising educational conferences; (4) a tape recording of a lecture given at an educational conference which several of the appellants attended concerning proper travel expense procedures; (5) expense records of the trust administrator and a trustee, showing that the trust administrator pocketed $19,439 of the $29,560 which he received as travel expense money; and (6) expense records of the San Diego–based carpenter's fund, showing that their trustees attended an educational conference in Hawaii for an average of $1,900 less per trustee than appellants reimbursed themselves for the same conference. Appellants claim that this evidence was irrelevant, prejudicial, and generally lacking in foundation, and that its admission constituted reversible error.

■ Our review of the district judge's admission of evidence is limited. He has wide discretion in determining whether evidence is supported by proper foundation, *United States v. Scully*, 546 F.2d 255, 269 (9th Cir. 1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), whether it is relevant, *United States*

*v. Cassasa*, 588 F.2d 282, 285 (9th Cir. 1978), *cert. denied*, 441 U.S. 909, 99 S.Ct. 2003, 60 L.Ed.2d 379 (1979), and whether its probative value substantially outweighs any danger of unfair prejudice. Fed.R.Evid. 403; *United States v. Martin, supra*, 599 F.2d at 889. We give wide latitude to the trial judge in determining the admissibility of evidence because he is in the best position to assess the impact and effect of evidence based upon what he perceives from the live proceeding of a trial, while we can only review a cold record. *See United States v. Robinson*, 560 F.2d 507, 514 (2nd Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978) (en banc). Thus, we have stated that "[d]istrict judges have great latitude in passing on the admissibility of evidence, and admission will not be overturned on appeal absent an abuse of discretion." *United States v. Kearney, supra*, 560 F.2d at 1369. *See* 1 Weinstein's Evidence ¶ 401[01]. A district judge abuses his discretion when he acts arbitrarily or irrationally. *United States v. Robinson, supra*, 560 F.2d at 515.

■ The district judge did not abuse his discretion when he concluded that sufficient foundation was laid for admission of the evidence. As foundation for the AFL–CIO Code of Ethics, the government introduced evidence that Local 89 had been a member of the AFL–CIO for over 16 years, and that the Code of Ethics had been expressly called to the attention of the board of trustees on at least two occasions prior to enactment of the deferred compensation scheme. As to the textbooks admitted into evidence, the government introduced evidence that copies were located in the San Diego office of Local 89 and that the publisher had mailed copies to the trustees and the trust office. Similar evidence supported the admission of the various educational conference brochures: the brochures were mailed to each trustee invited to attend the conferences. As foundation for the tape recording, the custodian of the tape testified about the time, place, and manner of its

creation, and of its continual custody in the archives of the national foundation for trustees. The appellants do not contest the foundation laid for admission of the individual and trust financial records.

We also conclude that the district judge did not abuse his discretion in deciding that the evidence was relevant. Appellants' primary defense was lack of criminal intent. The Code of Ethics, textbooks, brochures, and taped lecture demonstrated that the trustees had a variety of sources informing them of the impropriety of their compensation schemes. These sources of information clearly tended to make the existence of appellants' criminal intent more probable than it would be without such evidence. *See* Fed.R.Evid. 401. The same can be said for the financial records admitted into evidence. They not only established the fact of overpayment, but also demonstrated a degree of excessiveness which was probative of appellants' intent.

We cannot say that the district judge abused his discretion by determining that the evidence was more probative than prejudicial. Each of the arguments made to us was also made to the district court in the form of objections, with seven defense lawyers arguing their client's evidentiary interests. Admission of this evidence was carefully considered and the district judge went to great lengths to instruct the jury as to its proper purpose. We find no indication that the district judge's actions were arbitrary or irrational, and thus his admission of this evidence does not constitute grounds for reversal.[26]

## C. *Armstrong's Contentions*

### 1. Absence At Trial

Armstrong contends that his right to be present throughout the trial was violated when, during his absence, the district judge permitted the jury to hear the testimony of witness Scannell read from the court reporter's notes. He contends that reversal is required because the testimony read to the jury was crucial to his case, and its reading during his absence created a reasonable possibility of prejudice.

Federal Rule of Criminal Procedure 43 provides that: "The defendant shall be present . . . at every stage of the trial including the impaneling of the jury and the return of the verdict . . . ." *See Rogers v. United States*, 422 U.S. 35, 38, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975); *Shields v. United States*, 273 U.S. 583, 588–89, 47 S.Ct. 478, 479, 71 L.Ed. 787 (1927); *United States v. Walls*, 577 F.2d 690, 698 (9th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978). This rule, however, is not absolute. *Polizzi v. United States*, 550 F.2d 1133, 1137 (9th Cir. 1976). A defendant may not complain of proceedings held while he was voluntarily absent, Fed.R.Crim.P. 43(b)(1); *United States v. Friedman*, 593 F.2d 109, 121 (9th Cir. 1979), and even involuntary absence may be harmless error. *Rogers v. United States, supra*, 422 U.S. at 40, 95 S.Ct. at 2095; *United States v. Walls, supra*, 577 F.2d at 698; *Polizzi v. United States, supra*, 550 F.2d at 1138; *United States v. Schor*, 418 F.2d 26, 30 (2nd Cir. 1969).

Armstrong relies heavily upon the second circuit case of *United States v. Schor, supra*, 418 F.2d 26, and contends that trial court proceedings in a defendant's absence automatically require reversal. However, the court in *Schor* recognized that permitting the jury to review testimony initially taken in open court with the defendant and his attorney present does not prejudice an absent defendant. *Id.* at 31. An earlier

---

**26.** Johnson and Thompson argue, and Little and Felix join, that the evidence of the trust administrator's and the carpenter trust's expenditures was irrelevant and prejudicial, because the trustees' expense practices were *common and lawful*. *Appellants introduced evidence of the propriety of their practice.* However, the evidence introduced by them does not make the trust administrator and carpenter trust evidence inadmissible. It simply goes to the weight of the evidence, and both sides were permitted to develop their case before the jury.

second circuit case, which decided the very issue raised by Armstrong, stated:

> [A]fter the jury had retired at the close of [defendant's] trial, they returned to the courtroom while he was not present and at their request the testimony of three witnesses was read to them. We are unable to discover any injustice or prejudice in this claimed defect; the reading of the testimony on the jury's request was quite proper, and [the defendant] was present and represented by counsel throughout the testimony at the trial. Even in the federal courts limited exceptions to an accused's absolute right to be present throughout his trial are permitted.

*United States v. Jackson*, 263 F.2d 282, 283 (2nd Cir. 1959) (per curiam). *See also United States v. Arriagada*, 451 F.2d 487, 489 (4th Cir. 1971), *cert. denied*, 405 U.S. 1018, 92 S.Ct. 1300, 31 L.Ed.2d 481 (1972). We agree with this reasoning.

 Although the record suggests that Armstrong's absence was voluntary,[27] we cannot conclusively determine that it was. Even if Armstrong's absence was involuntary, however, reversal is not required. Armstrong was present and represented by counsel during Scannell's testimony and was free to object to any improprieties in that testimony. When the testimony was later read to the jury the district judge made no comments on the evidence and gave no additional instructions. Moreover, other appellants and their counsel were present during the reading of the Scannell testimony and did not object to anything that occurred. *See United States v. Friedman, supra*, 593 F.2d at 121. That Armstrong did not object to the proceedings by moving for mistrial or a new trial also suggests that no prejudice was perceived by him at the close of trial, and we perceive none now. *See United States v. Diggs*, 522 F.2d 1310, 1320 (D.C.Cir.1975), *cert. denied sub nom*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *United States v. Arriagada, supra*, 451 F.2d at 489. Thus, even if the absence was involuntary, we conclude that no possibility of prejudice resulted.[28]

2. Sentencing

 Following Armstrong's conviction the district judge sentenced him to ten years imprisonment with possibility of parole. Armstrong was immediately freed on bail pending appeal. Two days later Armstrong was returned to the court, his sentence was vacated, and he was resentenced to five years imprisonment on Counts 1 and 10, to run consecutively, five years imprisonment on Counts 2, 3, 6, 8, and 9, to run concurrently, three years imprisonment on

---

27. Several hours before the Scannell testimony was read to the jury, those defendants being tried without a jury were arguing their cases to the district judge. At the conclusion of those arguments the district judge told the parties present that the Scannell testimony would be read to the jury later in the day and said: "We're notifying everybody at once to be present and those that want to be present will be." When the court reconvened several hours later for the reading of the testimony Armstrong and his counsel were not present. Several other defendants and their counsel were present. The record does not reveal whether Armstrong ever received notice of the reading, but he has not claimed before us that the district court failed to give him such notice.

28. *Akins v. Cardwell*, 500 F.2d 47, 47 (9th Cir. 1974) (per curiam), suggests that a presumption of prejudice arises when any portion of a trial occurs during a defendant's or his counsel's absence, and that the government must clearly rebut that presumption. However, our more recent cases do not follow the *Akins* presumption. In *United States v. Cassasa*, 588 F.2d 282 (9th Cir. 1978), *cert. denied*, 441 U.S. 909, 99 S.Ct. 2003, 60 L.Ed.2d 379 (1979), for example, we responded to the defendant's presumption of prejudice argument by stating that: "[c]ounsel's absence during judge–jury communication is harmless error if no reasonable possibility of prejudice could result." *Id.* at 285. Thus, the government bears the burden of proving that the defendant's absence was harmless only if the absence presents a reasonable possibility of prejudice. For reasons set forth in the text, we conclude that no reasonable possibility of prejudice to Armstrong arises from the reading of the Scannell testimony in his absence.

Count 12, to run concurrently, and ten years imprisonment on Count 15, to run concurrently with the consecutive sentences on Counts 1 and 10. The district judge explained that he had erred in pronouncing the first sentence because he did not then realize that the ten year sentence could be imposed only on Count 15. He therefore resentenced Armstrong to conform to his original intent.

Armstrong relies upon *Ex parte Lange*, 85 U.S. 163, 18 Wall. 163, 21 L.Ed. 872 (1874), and contends that imposition of the second sentence constituted double jeopardy. He argues that the second sentence is void, and that those portions of the first sentence which exceeded the statutory maximum punishment are invalid. Thus, he characterizes his valid sentence as ten years imprisonment on Count 15 and five years concurrent imprisonment on all other counts.

Armstrong's reliance on *Lange* is misplaced. The defendant in *Lange* had already suffered punishment under his first sentence when the second sentence was imposed, and the court expressly stated that it was the imposition of two punishments, not the imposition of two sentences, which violated the double jeopardy clause of the Fifth Amendment. *Id.* at 169–76. Thus, the holding of *Lange* may not be expanded, as Armstrong would have us do, to prohibit the imposition of two sentences in this case.

However, this distinction of *Lange* does not mean that the trial judge may freely impose second sentences whenever the first sentence has not been fully served. We have held that a trial judge may not resentence a defendant, even if he does so only to make the sentence conform to his original intention, if the defendant has commenced serving the first sentence. *Kennedy v. United States*, 330 F.2d 26, 27 (9th Cir. 1964); *Deutschmann v. United States*, 254 F.2d 487, 489 (9th Cir.), *cert. denied*, 357 U.S. 928, 78 S.Ct. 1377, 2 L.Ed.2d 1374 (1958). We have also warned against "a broad rule which would allow a sentence to be changed to conform with the original intention of the sentencing judge," because "[s]uch a rule would present too great a potential for abuse." *United States v. Best*, 571 F.2d 484, 486 (9th Cir. 1978).

This case presents a different situation. When Armstrong was called back to court for correction of sentence he was free on bail and had not started serving his first sentence. We do not believe that the mere oral pronouncement of the first sentence placed Armstrong in jeopardy so as to make that first sentence uncorrectable.

Nor do we think the Fifth Amendment gives it such consummate finality that the court is precluded from correcting an inadvertent pronouncement, even by increasing the penalty, provided the change is made as promptly as was done in this case. Appellant's view, carried to its logical extreme, would prevent a correction of mere inadvertence at any time after it occurs, even in the next breath. So construed, the Amendment would embalm into constitutional right an act of pure inadvertence, although every consideration of justice and its proper administration requires that this most solemn judicial step be taken with no taint of accident or inattention, but with the utmost deliberation and presence of mind. Courts, being human, cannot avoid occasional lapses characteristic of humanity, nor can the Constitution prevent them. It can only guard against their consequences. But it would not do so by perpetuating or making them inescapable. The sounder view would be that the lapse would vitiate the sentence, with the consequence that it would be void and no bar to a later and deliberate pronouncement of judgment . . .

*Rowley v. Welch*, 114 F.2d 499, 503 (D.C.Cir. 1940). Thus, we hold that a district judge may promptly act to correct a misspoken sentence when the defendant has not started serving that sentence. *See United States v. Davidson*, 597 F.2d 230, 233 (10th Cir.), *cert. denied*, 444 U.S. 861, 100 S.Ct. 127, 62 L.Ed.2d 83 (1979); *Vincent v. Unit-*

ed States, 337 F.2d 891, 894 (8th Cir. 1964), cert. denied, 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281 (1965); Walton v. United States, 202 F.2d 18, 19–20 (D.C.Cir.1953). The corrected sentence imposed upon Armstrong is valid.

## D. Prosecutorial Misconduct

Armstrong and Felix contend that the prosecutor made prejudicial misrepresentations and argumentative statements before the jury. Armstrong identifies 33 such instances which he claims so tainted the trial as to require reversal of his conviction.

Alleged prosecutorial misconduct must be viewed, to the fullest extent possible, in the context of its occurrence. An appellate court should take into account all of the testimony and exhibits introduced during the trial, the district judge's instructions to the jury, and the district judge's reactions to the alleged misconduct as it occurred. United States v. Cash, 499 F.2d 26, 29 (9th Cir. 1974). If misconduct did occur, we must determine whether it denied appellants a fair trial. United States v. Polizzi, 500 F.2d 856, 892 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); United States v. Fernandez, 497 F.2d 730, 735 (9th Cir. 1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975).[29]

Most of the incidents identified by Armstrong were not misconduct at all; they were nothing more than the occasionally long–winded colloquy during a hotly contested criminal trial. A few of the prosecutor's statements, questions, and objections were argumentative. However, they do not approach the misstatements of fact, misrepresentation of evidence, reliance on matters not in evidence, and harassment of

witnesses condemned in the cases cited by Armstrong and Felix. See Berger v. United States, 295 U.S. 78, 84, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935); United States v. Meeker, 558 F.2d 387, 389 (7th Cir. 1977); King v. United States, 372 F.2d 383, 389–95 (D.C.Cir.1967). Viewing these few incidents in light of the evidence produced at trial, the district judge's reaction, and considering the evidence in the midst of more than 8,000 pages of reporter's transcript, we are convinced that they had no impact upon the jury's verdict. Nothing said or done deprived appellants of a fair trial. See United States v. Polizzi, supra, 500 F.2d 856, 892 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); United States v. Cash, supra, 499 F.2d at 29.

AFFIRMED IN PART AND REVERSED IN PART.

---

29. United States v. Cash, 499 F.2d 26 (9th Cir. 1974), relied upon Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for the proposition that incidents of prosecutorial misconduct must be harmless beyond a reasonable doubt to avoid reversal. United States v. Cash, supra, 499 F.2d at 29. However, Chapman established the "harmless beyond a reasonable doubt" standard for constitutional errors only. Id. at 22–24, 87 S.Ct. at 827–828. Although Chapman involved prosecutorial misconduct, it was that misconduct's impact upon

the defendants' constitutional privilege against self–incrimination which was at issue. Id. at 19–20, 87 S.Ct. at 827–828. Thus, we decline to apply the constitutional standard of Chapman to this non–constitutional question of prosecutorial misconduct, and apply instead the fair trial standard of United States v. Polizzi, 500 F.2d 856, 892 (9th Cir. 1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975), and United States v. Fernandez, 497 F.2d 730, 735 (9th Cir. 1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975).