UNITED STATES of America, Appellee,

v.

Rogelio Mota VALDOVINOS, Appellant.

UNITED STATES of America, Appellee,

v.

Eudoro Gonzales FARIAS, Appellant.

Nos. 76–2322, 76–2493.

United States Court of Appeals,
Ninth Circuit.

July 27, 1977.

---

Lorenzo E. Patino, argued, Sacramento, Cal., for appellant Farias.

Frank Reynoso, argued, Sacramento, Cal., for appellant Mota Valdovinos.

Donald H. Heller, argued, Thomas T. Couris, Asst. U. S. Attys., Sacramento, Cal., for appellee.

Before KILKENNY, SNEED and KENNEDY, Circuit Judges.

KILKENNY, Circuit Judge:

The appellants were indicted, tried by a jury, and convicted of conspiracy to possess with the intent to distribute and to distribute heroin [21 U.S.C. §§ 841(a)(1), 846], and with aiding and abetting the distribution of heroin [18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)]. Appellant Farias was also convicted of possession of 4.31 grams of heroin with the intent to distribute [21 U.S.C. § 841(a)(1)]. We affirm.

## BACKGROUND

The appellants are charged with conspiring with four others to possess and distribute heroin, etc. They acknowledge the existence of the conspiracy, but argue that the evidence was insufficient to prove their participation therein or their aiding and abetting thereof. Inasmuch as this is their central challenge, we will give an overview of the conspiracy and then detail the evidence of the appellants' participation.

In January of 1976, Agent Loya of the Drug Enforcement Administration met with two of the conspirators to discuss the purchase of heroin. On January 22, 1976, after having received some samples, Loya bought one ounce of heroin with marked money from conspirator Alvarez. The following day, Loya agreed with Alvarez on the purchase of approximately thirty additional ounces of heroin. Though delivery was expected on January 27, 1976, it did not then take place because Loya learned from Gonzales [another conspirator] that the supplier was unwilling to deal in such a large quantity with a stranger. To alleviate the supplier's fear, Loya agreed with Gonzales on January 28, 1976, to purchase two ounces of heroin that evening. Problems developed with this purchase too, however, and Loya ultimately purchased from Alvarez only one ounce that evening, again with marked money.

In a phone conversation on January 29, 1976, Alvarez, the ringleader, told Loya that he was getting nervous because he had thirteen ounces of heroin at his home on Robinson Road. The two agreed to meet for "the buy" of this thirteen ounces at 3:30 that afternoon at the K-Mart parking lot in Modesto, California. Each of the appellants was also present at this time and was arrested.

At trial, the details of the conspiracy and the extent of the appellants' participation therein came primarily from the testimony of state and federal surveillance agents. The evidence shows that agents observed Alvarez, after his meeting with Loya, on January 22, 1976, speaking to one of the conspirators [Hernandez] in a 1972 Chevrolet Vega [Vega]. Ray Gonzales was the other occupant of the Vega; he eventually left with Alvarez in a 1960 Chevrolet pickup [pickup]. They drove to Alvarez's home at 1940 Robinson Road in Modesto. The Vega was followed to 2141 Harold Street in Ceres, California.

On January 28, 1976, the pickup was observed parked at the Robinson Road address and the Vega was observed in the vicinity. Later that day, Alvarez, Gonzales, and Hernandez left in the Vega to meet Loya. When the Vega later returned to Robinson Road, Alvarez and Gonzales got out and Hernandez drove to 2228 Fifth Street in Ceres, California [the home of appellant Valdovinos].

The next morning [the day scheduled for the 13 ounce purchase], Hernandez left the Fifth Street address in the Vega and drove to the Harold Street address where the

appellant Farias was waiting outside. The two drove back to Fifth Street where they conversed inside the car for approximately ten minutes. They then went to a tavern for a period of time and returned to Fifth Street where they stayed five minutes. The pair then drove to Harold Street, also staying five minutes, before returning to Fifth Street. When the Vega did leave the Fifth Street address, it was followed by a brown Pontiac occupied by both appellants; both cars proceeded to 1940 Robinson Road. The Vega parked there, but the Pontiac drove into a nearby school parking lot where a surveillance team was seated in a parked automobile. Since the two appellants merely stared at the two officers as they slowly drove around, the officers determined that their surveillance had been uncovered and they returned to their police headquarters. When another vehicle took up surveillance at the same location, the appellants drove slowly around it too. In the opinion of two police experts, this activity of the appellants indicated that they were engaged in "counter-surveillance," a term describing attempted surveillance by criminals to uncover possible police surveillance. *Cf.* Rules 701, 702, FRE.

Shortly thereafter, the appellants rendezvoused with the Vega. Then, in a three-vehicle caravan, the appellants [still in the Pontiac], Alvarez [in the pickup], and Hernandez and Gonzales [in the Vega] proceeded to the K-Mart store where the purchase was to take place. When they arrived at the intersection of Evergreen and Bridgemore, the first two vehicles, the pickup and the Vega, made a right turn into the driveway of the K-Mart parking lot; the Pontiac proceeded up Bridgemore Avenue and entered the K-Mart lot from that entrance. The pickup pulled up adjacent to the Auto Store, while the Vega circled up in front of the main store, stopping momentarily, and proceeding to a parking spot. As the sale of heroin was taking place in the pickup truck, an arrest signal was given and each of these men was arrested. The subsequent search of the appellant Farias resulted in the seizure of the 4.31 grams of heroin. The search of appellant Valdovinos re-

vealed, *inter alia*, that he possessed six marked one-hundred dollar bills that had been used by the police in the previous heroin purchases. In addition, Alvarez had a loaded .38 caliber revolver and shoulder holster under his leather coat, and a loaded 9 m.m. semi-automatic pistol containing 14 live rounds [cocked and ready to fire] was retrieved from under the left front seat of the Vega.

Additional facts will be discussed in the following section.

## SUFFICIENCY OF THE EVIDENCE OF THE CONSPIRACY

▇ At the outset, the appellants are confronted with the well-established rule that once the existence of a conspiracy is established, only slight evidence is required to connect any given defendant with it. *United States v. Scholle*, 553 F.2d 1109, 1118 (C.A.8 1977); *United States v. Costey*, 554 F.2d 909 (C.A.9 Jan. 31, 1977 as amended April 20, 1977), *cert. denied* —— U.S. ——, 97 S.Ct. 2928, 53 L.Ed.2d 1065; *United States v. Peterson*, 549 F.2d 654, 657 (C.A.9 1977); *United States v. Testa*, 548 F.2d 847, 853 (C.A.9 1977); *United States v. Freie*, 545 F.2d 1217, 1221 (C.A.9 1976), *cert. denied Gangadean v. U. S.*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977); *United States v. Westover*, 511 F.2d 1154, 1157 (C.A.9 1975), *cert. denied* 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975). Inasmuch as the existence of the conspiracy is not challenged, we need decide only whether there is slight evidence to connect the appellants with it. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we find that there is.

We note, *inter alia*, that the appellants had a number of contacts with the other conspirators at the addresses under surveillance. More importantly, they were involved in counter-surveillance for police officers in the area of the Robinson Road address where the large amount of heroin was kept pending delivery to Loya. On the

same day [January 29, 1976], both participated in a convoy to the K-Mart store where Alvarez sold the thirteen ounces of heroin. Further indicative of appellant Valdovinos' guilt is the fact that he had in his possession at the time of his arrest six of the marked one-hundred dollar bills previously used by the government to purchase heroin from the ringleader Alvarez.

■ Moreover, the record in this case is replete with circumstantial evidence of the appellants' guilt. It is a well-established rule in this circuit that circumstantial evidence is not inherently less probative than direct evidence. *United States v. Green*, 554 F.2d 372, 375 (C.A.9 1977); *United States v. Cruz*, 536 F.2d 1264, 1266 (C.A.9 1976); *United States v. Turner*, 528 F.2d 143, 162 (C.A.9 1975), *cert. denied Grimes v. U. S.*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). Beyond question, the jury could consider the plausibility/implausibility of the appellants' stories at the time of arrest. Valdovinos, for example, after being warned of his rights in the Spanish language, said that he had won the six [marked] one-hundred dollar bills playing pool in Hughson, California, a few days earlier. He could remember neither the name of the pool room nor the name of the person from whom he won the money. His testimony at trial, however, was that the money had been a loan from his brother-in-law [Hernandez] whom he had followed all over the city of Modesto [to such locations as the school parking lot, a store on Robinson Road, and the K-Mart parking lot] looking for his uncle.

The stories of Farias were subject to similar scrutiny by the jury. At the time of his arrest, in explanation of his possession of heroin, he stated that as he was leaving a movie theatre in San Jose, a person just came up to him and gave him the heroin. He could not describe the donor; nor was he certain as to the location of the theatre. He also stated that *he did not use drugs* and that *he did not know why he had heroin in his possession.* His testimony at trial was that the heroin was given him in exchange for a $35.00 coat, a far cry from the $800.00

street value placed on the drug by the officers. Regarding his constant companionship with the others during this time period, Farias testified that he, too, was looking for the uncle of Valdovinos. Farias had heard that he [the uncle] was going to Mexico and he wanted to give him some clothes for a young child that was there. He was going to purchase the clothes with a check [made out to a person he did not know] that someone had given to him.

In light of all this direct and circumstantial evidence, and the conflicting stories of the appellants, we have no doubt but that the jury could conclude, beyond a reasonable doubt, that the appellants were willing participants in the conspiracy. *Cf. United States v. Lustig*, 555 F.2d 737, 750 (C.A.9 1977).

## OTHER CONTENTIONS

■ The appellants received concurrent sentences on both the conspiracy count and the aiding/abetting count. In addition, the appellant Farias received a sentence on the possession of heroin count to run concurrently with the above. Consequently, we need not, unless we so choose, pass upon the sufficiency of the evidence as to these additional counts. *Benton v. Maryland*, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *United States v. Chenaur*, 552 F.2d 294, 302 (C.A.9 1977); *Costey, supra,* at 910.

■ In this case, however, in the exercise of our discretion, *cf. United States v. Rodriguez*, 546 F.2d 302, 308 (C.A.9 1976) we have decided to pass upon the sufficiency of the evidence on the 21 U.S.C. § 841(a)(1) count. As stated above, the appellant Farias had in his possession at the time of arrest 4.31 grams of 12% purity heroin. He maintains that this is an insufficient quantity upon which to infer an intent to distribute. He relies upon *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), where the Court held that the possession of 14 grams of 5% cocaine was insufficient to support a similar inference. *Turner*, of course, is distinguishable on a number of grounds, including the fact that we are here dealing with *heroin*, a Schedule I Controlled

Substance, whereas *Turner* dealt with *cocaine*, a much less potent drug classified under Schedule II. We hold that it can be said with substantial assurance on this record that the presumed fact [intent to distribute] is more likely than not to flow from the proven fact [possession]. *See Turner, supra*, at 405, 90 S.Ct. 642. Although it would be difficult to arrive at the presumed fact based on *mere possession alone*, we have considered that fact along with all the other direct and circumstantial evidence in this record, and think that there was sufficient evidence for the jury to find, beyond a reasonable doubt, an intent to distribute.

First *Turner* noted that the possession there could as easily have been for personal use as for sale. This is an important factor here because Farias testified that he had only used heroin twice in his life and that he was not a regular user. Moreover, the appellant bore no injection marks; nor did he bear any signs that he sniffed the heroin through his nose. It is clear, therefore, that the appellant needed none of this heroin for his personal use.

Second, there is evidence here that the heroin seized was of higher quality than that usually found on the street in Modesto. It could have been cut two times according to the testimony of an officer of the Modesto Police Department. *Cf. United States v. Ramirez-Rodriquez*, 552 F.2d 883, 885 (C.A.9 1977).

Third, the fact that this drug had a street value of $800.00 supports the findings made by the jury. *See Ramirez-Rodriquez, supra*, at 884–5 [testimony that the street value was between $700.00 and $900.00; conviction upheld on the ground that the jury could infer an intent to distribute]. This inference is even more compelling here when one considers the fact that Farias had been out of work for more than seven months at the time of his arrest. Additionally, he had only $2.00 in cash in his possession when arrested.

In short, we think that the jury could properly conclude that the appellant was holding the 4.31 grams of heroin for distribution.

## CONCLUSION

The judgments of conviction must be affirmed.

IT IS SO ORDERED.