**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lamar ADAMS, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Lee PINKERTON, Defendant-Appellant.**

**Nos. 77–1878, 77–1879.**

United States Court of Appeals, Ninth Circuit.

June 14, 1978.

Rehearing and Rehearing En Banc Denied Aug. 28, 1978.

William Graham (argued), Los Angeles, Cal., for defendants-appellants.

Thomas J. Nolan, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and SOLOMON, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Adams and Pinkerton appeal their convictions for conspiracy, assault with intent to rob, robbery, and murder. 18 U.S.C. §§ 2, 371, 1111, 1114, 2114. Pinkerton contends he was improperly joined for trial. Adams appeals on that ground and others.

## I. FACTS

In mid-September, 1976, Ward,[1] Adams, and Pinkerton, a postal employee then suspended without pay, agreed to undertake a postal robbery.[2] In the succeeding four months, the trio staged a series of attempt-

---

* Senior District Judge, District of Oregon.

1. In exchange for his cooperation and testimony, the government allowed Ward to plead guilty to count II of the indictment, which charged him with aiding and abetting the Octo-
ber 18 robbery of Solat. All other charges against Ward were dismissed.

2. This agreement and the circumstantial evidence of its continuing nature form the basis of the conspiracy charge (count I).

ed armed robberies utilizing Pinkerton's knowledge of local postal routes. Their one "success" resulted in the death of a postal employee.

On September 28 Pinkerton drove Adams and Ward to an alley he knew to be the last leg of a postal route. Adams and Ward feigned a scuffle to cause the driver to slow his truck. As the vehicle neared, Ward attempted to grab its ignition key, and Adams drew his gun. Ward restrained Adams and the postal employee drove away unharmed.[3]

On October 18,[4] the three drove to the Lennox Post Office, where Pinkerton, dressed in his postal uniform, stopped a post office truck by requesting a ride to the main terminal. Solat, the driver, knew Pinkerton and agreed to give him the ride. Pinkerton and Adams then commandeered the vehicle, while Ward followed in Adams' car. They parked the truck under a freeway. Pinkerton jumped from the truck with the mail pouches and entered the car with Ward. Adams remained in the truck, fired five shots, then joined the others.[5]

The trio left the truck and drove to the home of Ward's mother. Pinkerton, still in uniform, carried the mail pouches into the den. In the presence of Walton, Ward's half-brother, they cut the pouches open and divided the money three ways. Each received about $3,200. They burned the unwanted pouches and mail. Authorities searching for Solat discovered the truck with Solat's body in it. He had been shot five times.

On December 23, Adams approached a driver loading his truck with receipts from the Willowbrook postal station. Adams drew his gun and ordered him into his truck, but the driver escaped on foot. Adams fled after unsuccessfully attempting to board the truck.[6]

Ward, Adams, and Pinkerton "cased" a location for another robbery on December 27, but abandoned the venture when Pinkerton recognized a postal inspector present there. Later the same day, Ward and Walton were arrested for possession of a dangerous weapon. Ward implicated Pinkerton and Adams in the Solat murder and agreed to cooperate with postal inspectors.[7]

On January 7, 1977, Adams and Pinkerton asked Ward to participate in yet another robbery. Ward informed the authorities and permitted postal inspectors to install a tape recorder in his car.

On January 11, Pinkerton, Adams, and Ward drove to a postal station to intercept a scheduled truck. The truck arrived, driven by a postal inspector. A second inspector crouched on the passenger's side. Adams and Pinkerton approached the truck from opposite sides.

Pinkerton asked for a ride and was refused. As he backed away he signaled Adams. The driver identified himself and ordered Pinkerton to stop. Adams, on the passenger's side, drew his loaded revolver and pointed it at the truck.[8] The second inspector stood up, ordered Adams to freeze, and fired a shot in his direction. Adams tossed away his weapon and dropped to the

---

**3.** The September 28 incident was the basis for count II, assault with intent to rob.

**4.** The robbery and murder of October 18 form the bases of counts III and IV respectively.

**5.** Ward testified he heard five shots and asked Adams how many times he had fired his weapon. Adams told him, "five times."

Morin, an eyewitness to the events of October 18, testified that two men approached the postal truck in a large black car. This conflicted with Ward's version of the event. Morin's testimony, refreshed under hypnosis, was

impeached by the prosecution, as discussed infra.

**6.** This incident formed the basis of count V, charging Adams alone with assault with intent to rob.

**7.** Ward did not implicate himself in the robbery and murder of Solat. Postal inspectors remained unaware of his involvement until they later received information from Walton.

**8.** Both Pinkerton and Adams were armed with loaded hand guns, but Adams' weapon did not have a round in the chamber when he pointed it at the truck.

ground uninjured.[9] Pinkerton and Adams were then taken into custody.

## II. JOINDER AND SEVERANCE

Both appellants contend they were improperly joined for trial. Pinkerton alleges that his joinder with Adams prejudiced his defense because the jury considered evidence with respect to the December 23 assault with which only Adams was charged. Adams contends that the five substantive charges do not constitute "[a] series of acts or transactions," so as to be properly joined under Fed.R.Crim.P. 8(b). He also argues that joining the murder charge was impermissibly prejudicial.

Rule 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■ The purpose of Rule 8(b) is to balance the need to avoid the potential prejudice that may result from joining multiple defendants with the need to attain trial efficiency. *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978); *United States v. Martin*, 567 F.2d 849, 853 (9th Cir. 1977); *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir. 1977); *United States v. Roselli*, 432 F.2d 879, 899 (9th Cir. 1970).

■ The relevant inquiry here is whether the five substantive offenses charged constitute a "series of acts or transactions." It is not sufficient that the acts charged only meet the "same or similar character" requirement of Fed.R.Crim.P. 8(a). *Satterfield*, 548 F.2d at 1344. To constitute a series, the acts must evince a more substantial relationship.

9. This final robbery attempt formed the basis of count VI of the indictment.

10. Although we doubt that the initial agreement contemplated the entire series of assaults, such a pervasive plan at the outset is not required. *Blumenthal v. United States*, 332 U.S.

■ We have held that a conspiracy count will provide the necessary link to satisfy the requirement of Rule 8(b). *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971); *Baker v. United States*, 393 F.2d 604 (9th Cir. 1968). This proposition has gained general acceptance. *United States v. Somers*, 496 F.2d 723 (3rd Cir. 1974); Wright & Miller, 1 Federal Practice & Procedure § 144.

The government may not, however, add a conspiracy count merely to bypass the requirements of Rule 8(b). The conspiracy must be charged in good faith. *Donaway*, 447 F.2d at 943; *United States v. Manfredi*, 275 F.2d 588, 593 (2nd Cir. 1960).

Both appellants were charged with and convicted of conspiracy. Pinkerton does not argue that the conspiracy charge was asserted in bad faith. Adams does allege bad faith, but fails to substantiate his allegation.

■ Viewing the evidence most favorably to the government, *United States v. Glasser*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Valdovinos*, 558 F.2d 531 (9th Cir. 1977), it was sufficient not only to establish the government's good faith in charging conspiracy, but to support the conspiracy convictions as well.[10]

We next consider whether the district court erred in denying the appellants' motions for severance from prejudicial joinder under Fed.R.Crim.P. 14.

■ Rule 14 motions for severance are committed to the sound discretion of the trial court. *Donaway*, 447 F.2d at 943. We will upset its ruling only upon proof of an abuse. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Kaplan*, 554 F.2d 958, 966 (9th Cir. 1977).

539, 556, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The ongoing relationship among the three and the similarity of the crimes over a short period of time convince us that there was an implicit continuing agreement to commit the crimes.

The test for determining whether the trial court abused its discretion is whether a joint trial was so prejudicial as to require the trial judge to exercise his discretion in but one way. *United States v. Campanale,* 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). The burden of demonstrating prejudice rests on the appellant, and is a heavy one. He must show more than that a separate trial might offer "a better chance" of acquittal. *United States v. Cella,* 568 F.2d 1266, 1288 (9th Cir. 1978), citing *Campanale,* 518 F.2d at 359.

Here the appellants can show no prejudice other than that which necessarily inheres whenever multiple defendants or multiple charges are jointly tried. Furthermore, the instructions delivered to the jury were calculated to remove, to the extent possible, any prejudice resulting from joinder.[11]

### III. PRE–TRIAL HYPNOSIS OF WITNESS

During their investigation postal inspectors hypnotized Morin, allegedly an eyewitness to the murder and robbery of Solat, in order to aid his recall. Adams unsuccessfully moved to have Morin's testimony limited to his prehypnosis statements. At trial the defense called Morin, and the prosecution discredited his testimony with, among other things, his posthypnosis statements. Adams contends this conduct impermissibly interfered with his right to call witnesses in his behalf.

Until today we have considered only in civil actions the admissibility of testimony based on memories refreshed under hypnosis. We have held that the fact of hypnosis affects credibility but not admissibility. *Kline v. Ford Motor Company, Inc.,* 523 F.2d 1067, 1069 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir. 1974).

Other courts considering this problem in the context of criminal trials have generally followed the same approach. *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312, 315–16 (1971); *Harding v. State,* 5 Md.App. 230, 246 A.2d 302, 311–12 (1968). Reversals have been predicated only on the failure to disclose the fact of hypnosis. *United States v. Miller,* 411 F.2d 825 (2nd Cir. 1969); *Emmett v. Ricketts,* 397 F.Supp. 1025 (N.D.Ga. 1975) (habeas writ issued). We believe this reasoning is sound.

We are concerned, however, that investigatory use of hypnosis on persons who may later be called upon to testify in court carries a dangerous potential for abuse. Great care must be exercised to insure that statements after hypnosis are the product of the subject's own recollections, rather than of

11. You should consider the instructions that I give you separately and individually with respect to each defendant on trial. I may mention the "defendant" but I am generally speaking about both defendants, and the instructions that I give apply to each defendant.

Again, it is your duty to give separate and personal consideration to the case of each individual defendant.

When you do so, you should analyze what the evidence shows in the case with respect to that individual, leaving out of consideration any evidence which may have been admitted solely against some other defendant.

Now, as I indicated, the indictment charged the defendants in several counts. Indeed, there are six counts, and each of these counts charges the defendants with a separate crime or offense.

Count Five, I don't believe Mr. Pinkerton is charged at all with any violation of the law, but it is of the utmost importance that each of these counts and the evidence applicable thereto, be considered separately.

You cannot just lump all the evidence together and say, "Well, there is a lot here. There is something going on," and just get a general impression as to whether a crime has been committed or whether one or the other of the defendants committed it.

You must evaluate the evidence concerning each count independently of the other counts. The fact that you may find the defendant guilty, either of them, or not guilty on one of the offenses charged should not control your verdict on the others. Each count has to be considered separately and each defendant has to be considered separately.

recall tainted by suggestions received while under hypnosis.[12]

■ Although we do not approve of the hypnosis methods used here,[13] Adams did not object to the adequacy of the foundation laid for the receipt of the testimony. Rather, he attempted to exclude all in-court testimony of Morin on the grounds that no testimony from witnesses who had been hypnotized could be reliable, and that the use of testimony of a witness who has been hypnotized would deny the defendant his Sixth Amendment right to confrontation and his right to call witnesses on his own behalf. The predicate for both constitutional arguments is that the in-court testimony of a witness who had earlier been subject to hypnosis is unreliable as a matter of law rendering the witness legally incompetent to testify. We rejected that premise in *Kline v. Ford Motor Company, Inc., supra,* and we see no reason for a different result in the context of a criminal case.

## IV.  JENCKS ACT CLAIM

Adams argues that he was denied access to the prosecution's notes of its interviews with Walton, a government witness. He contends the notes were discoverable under the Jencks Act as construed by *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). *Goldberg* held that notes taken by government attorneys while interviewing their witnesses may be discoverable if they are "truly the statement of the *witness* —that is, a statement written and signed or otherwise adopted or approved by him or a substantially verbatim recording of an oral statement  .   .   .." 425 U.S. at 102 n.5, 96 S.Ct. at 1344. (emphasis in original).

At the close of Walton's direct testimony, the defense moved for disclosure of the notes taken during his pre-trial interviews.

The court held a hearing on the motion, and conducted an *in camera* inspection of the requested notes. During the hearing Walton examined them page by page. Walton had seen and adopted or acknowledged some of the notes. Others he had merely confirmed as accurate representations in response to the interviewing attorneys' recitations.

■ *Goldberg* makes it clear that "discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500(e)(1), which is satisfied only when the witness has 'signed or otherwise adopted or approved' what the lawyer has written." 425 U.S. at 110 n.19, 96 S.Ct. at 1348.

Here, the district court found that the unreleased statements were not written, signed, or adopted by the witness. His findings are not clearly erroneous, and we will not disturb them. *Campbell v. United States,* 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963).

## V.  CURTAILMENT OF CROSS–EXAMINATION

■ Walton testified to seeing Adams with a gun on many occasions. On cross-examination, Adams' counsel asked Walton if he knew why Adams carried the weapon. The trial court sustained the government's objection to the inquiry.

The prosecution objected because the question called for hearsay and involved a collateral matter. The defense made an offer of proof, but did not pursue the line of questioning. The ruling of the district judge was well founded and not an abuse of discretion. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *cf. United States v. Brady,* 561 F.2d 1319, 1320 (9th Cir. 1977) (undue restriction); *United*

---

**12.** We think that, at a minimum, complete stenographic records of interviews of hypnotized persons who later testify should be maintained. Only if the judge, jury, and the opponent know who was present, questions that were asked, and the witness's responses can the matter be dealt with effectively. An audio or video recording of the interview would be helpful.

**13.** An uncertified hypnotist conducted the session. No record was made of the identity of those present, the questions asked, or the responses given.

*States v. Alvarez-Lopez,* 559 F.2d 1155 (9th Cir. 1977) (restrictions amounting to denial of confrontation right).

## VI. OTHER ISSUES

■ Adams argues that count IV of the indictment, charging him with the murder of Solat, does not allege a federal offense. He claims that 18 U.S.C. § 1114, by referring to 18 U.S.C. § 1111, limits federal jurisdiction over the murder of postal employees to those occurring in the special maritime and territorial jurisdiction of the United States. The argument is frivolous.

■ Adams also argues that the evidence is insufficient to sustain his conviction on count VI (the January 11 assault with intent to rob), and that an instruction on that count was erroneous. Our affirmance of count IV and the concurrent sentence rule make it unnecessary to reach these contentions. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *United States v. Ratcliffe,* 550 F.2d 431, 433 (9th Cir. 1977); *United States v. Carpio,* 547 F.2d 490, 492 (9th Cir. 1976). In any event, we think the evidence was sufficient and the instructions were proper.

Appellants' convictions are affirmed on all counts.