# KENNETH EDGAR POLK v. STATE OF MARYLAND

[No. 781, September Term, 1980.]

*Decided April 9, 1981.*

The cause was argued before GILBERT, C. J., and MOORE and LISS, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Michael A. Anselmi, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Neal P. Myerberg, State's Attorney for St. Mary's County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This appeal presents anew the issue of the admissibility of hypnotically induced testimony.[1] The testimony here was that of an eight-year-old boy, the prosecuting witness in the trial of appellant, a forty-year-old man, for alleged sexual offenses. Under the circumstances shown, and for the reasons stated, we reverse and remand for a new trial.

## I

The appellant, Kenneth Edgar Polk, resided in St. Mary's County in a common-law relationship with Sharon K. Crusie, a divorcee, and her two subteen daughters. Their next-door neighbors, a family of four, included an eight-year-old boy named "Bobby." Sharon Crusie's younger daughter, Kim, was a playmate of Bobby's and the boy was a frequent visitor at appellant's home.

Appellant was charged in a four-count information with committing second and fourth degree sexual offenses,

---

1. This issue was addressed by the Court in 1968 in the now leading case of *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 252 Md. 731, *cert. denied,* 395 U.S. 949, 89 S. Ct. 2030, 23 L. Ed. 2d 468 (1969), where we held the testimony admissible and, under the facts presented, sufficient to support a jury verdict of guilt of attempted rape where:

"(1) the hypnosis procedure was fully exposed in the evidence; (2) the man who induced the hypnosis was a professional psychologist and gave his opinion that there was no reason to doubt the truth of the witness' statement; (3) there was sufficient corroboration of the witness' testimony: (a) male sperm was found in the victim's vagina, (b) the accused was one of two males shown to have known where the victim could have been found when the crime was committed, (c) the accused was seen in a station wagon immediately prior to the time the crime was committed. In addition, a precautionary instruction was given." *Id.* at 247, 246 A.2d at 312.

*See also* State v. Temoney, 45 Md. App. 569, 414 A.2d 240 (1980).

unnatural or perverted sexual practices, and assault and battery against Bobby on June 10, 1979.[2] The factual and procedural details of the case against Mr. Polk, relevant to this appeal, have to be distilled from the pretrial hearing on Polk's motion to suppress Bobby's testimony,[3] as well as the subsequent trial.

## The Suppression Hearing

The State apparently disclosed to appellant's counsel prior to trial that Bobby had been subjected to hypnosis by a State Trooper, Sergeant Lloyd E. White. Appellant thereupon moved to suppress the testimony of the boy and/or the Sergeant on the ground that such testimony was inadmissible as a matter of law.

Some two weeks before trial, a hearing on the motion was held in open court. The only witness was Sergeant White. The transcript of the hearing discloses that White was a criminal investigator with the Maryland State Police, Annapolis Barracks, and a veteran of 20 years' service. He was the supervisor of the Mobile Crime Lab, a polygraph examiner, and had a college degree in psychology. He testified that he had trained for several months in the use of investigative hypnosis. This training consisted of attendance at a two-day seminar conducted by Dr. Daniel Stern, a clinical psychologist in Towson, Maryland, and the reading of three books on the subject of hypnotism. He had never qualified as an expert in hypnosis in any court.

According to the Sergeant, he was requested by Corporal Whitney of the Maryland State Police to engage in an hypnotic procedure with Bobby who was suffering an apparent "retrograde amnesia" pertaining to an incident which had occurred at appellant's home. Word of the incident had, it seems, been communicated to Bobby's mother by the mother of another little boy, a friend of Bobby's, and Bobby's mother then contacted the Maryland State Police.

---

**2.** The original information, amended prior to trial, alleged that the offenses occurred on August 1, 1979.

**3.** The motion to suppress was also directed against testimony of Sergeant Lloyd E. White, *infra,* who placed Bobby under hypnosis.

An hypnotic session took place at Sergeant White's office on November 20, 1979, approximately five months after the alleged incident. This was the third such experience by the Sergeant with a subject.[4]

In a discussion with Corporal Whitney and the boy's mother prior to the session, Sergeant White was informed that the purpose of the hypnotic procedure was to determine whether Bobby could remember any sexual contact with appellant. There then ensued a "preliminary" interview with Bobby for 20 to 25 minutes, followed by an hypnotic session of some 25 to 30 minutes duration. The Assistant State's Attorney in charge of the case was present, as was the boy's mother. Defense counsel was not then in the case, no charges having been filed until December 27, 1979. The entire session was taped but Sergeant White testified that, through some inadvertence, *the tape of the preliminary session had been erased.*

At the suppression hearing, the remainder of the tape was played for the court. Near the beginning, the Sergeant called upon his subject to relax, and suggested that he recall an occasion when he was in a bedroom in appellant's house, with Kim, Mrs. Crusie's daughter.[5] After the boy responded that appellant came into the bedroom and sent Kim on an errand, the tape continued:

"Q. All right, so, you go back in the room and what did Kenny [appellant] say to you?

A. He asked me questions about sports.

Q. Okay. Take another deep breath. Relax, relax, deep breath. I see you are yawning and that means that you are completely relaxed. And, that is good, Okay, relax. Deep relax, okay. Now, after Kenny asked you about the sports, I want you to tell me what is the next thing he said?

---

**4.** Sergeant White testified that he consulted with Dr. Stern prior to the session and had been coached by him.

**5.** Appellant's trial counsel elicited from Sergeant White that he had learned about Kim during the erased pre-test with Bobby.

A.   He didn't say nothing else.

Q.   Okay. Did he then walk over to you? Okay. Then what did he do?

A.   He unzipped my fly.

Q.   He unzipped your fly. And, did he take your penis out? All right. In your mind's eye, I want you to relax and take a deep breath. Excellent, that's good. Now, I want you to tell me the next thing he did? Completely relax.

A.   He sucked my privates.

Q.   Okay. And, after he finished sucking your privates, I want you to tell me what he said after that.

A.   He said are we still friends.

Q.   Are we still friends. And, what did you say?

A.   Uh-uh.

Q.   Now, after you said uh-uh — now, take another deep breath. That's good. That's good. Okay, after you said uh-uh what did he say?

A.   He didn't say nothing.

Q.   What happened after he didn't say anything — did you just —

A.   He opened the door and went out.

Q.   Okay. Did he expose himself to you? Did he have his penis out?

A.   What?

Q.   Did he have his penis out?

A.   Uh-uh.

Q.   All right, okay. Were you afraid of Kenny? Why are you afraid?

A.   Because of what he done.

Q.   Are you still afraid of Kenny?

A.   No, because he moved away." [6]

---

**6.** At the conclusion of the tape, Sergeant White was asked by defense counsel at what point in time the child was hypnotized. He responded, "I would say initially when I started with the eye closure." He also testified

Appellant's pretrial motion to suppress the testimony of the boy and/or the Sergeant contended that such testimony would be the product of "an inexact and unproven science" and was inadmissible as a matter of law. At the suppression hearing, defense counsel also argued that Sergeant White would not qualify as an expert in the field of hypnosis, that his questions to the boy were improperly suggestive and that there was an impermissible lapse of time — more than four months — between the date of the alleged incident and November 20, when the hypnotic session was conducted. The State argued that the testimony was admissible, and asserted that the question of its sufficiency "will be a matter for the court to deal with at the trial."

In denying appellant's motion to suppress, Judge Mattingly stated, in part:

> "As I say, it goes to the weight of the testimony rather than the admissibility. I think, it is true, he has little experience and he has honestly stated that he has little experience, and very little formal education in this field. So, it is up to the jury and if they want to disregard and it is in their prerogative and it is not for the Court to throw it out."

## The Trial

At the trial, Sergeant White was not called.[7] The State's witnesses were, in the order presented, Bobby's parents, his twelve-year-old sister, and Bobby himself. When Bobby was called, appellant objected on the ground that it would be improper for him to testify "until a foundation was first laid" by the testimony of the Sergeant. The court overruled the objection, stating:

---

that the boy's nodding of his head "meant that he was definitely under hypnosis." Under further questioning, however, he said that he "really [did not] know if this young man was under hypnosis or not." On this appeal, both sides have proceeded on the premise that Bobby was, in fact, hypnotized.

**7.** On appeal, the State observes in its brief that, "[a]t trial the State chose not to introduce the fact that the victim's memory was previously refreshed by a prior hypnotic session. . . ."

"The Court has already ruled on the motion to suppress and I can't tell the State how to try the case."

Bobby's testimony was substantially the same as his responses to Sergeant White at the hypnotic session.[8] On cross-examination, for reasons not disclosed on the record — but presumably explainable as "trial tactics" — appellant's counsel did not interrogate Bobby about the hypnotic procedure. Counsel came no closer to that subject than to elicit the boy's affirmation that he had no recollection of the incident and "forgot the nasty part" until he spoke with "Mr. White."

At the close of the State's case, appellant moved for judgment of acquittal on the ground that the alleged victim's testimony had been erroneously received. The motion was denied. The court again observed, "I don't think it is proper for me to tell the State who to call."

Appellant took the stand in his own defense and also presented the testimony of Sergeant White, Sharon Crusie, and three character witnesses. Oddly perhaps, the Sergeant was interrogated on a collateral point, unrelated to hypnosis. Mr. Polk's trial counsel also intended to offer the testimony of a psychologist, a Doctor Gravitz, that hypnotically induced testimony is unreliable and that the procedure employed by Sergeant White was improper.

The State's objection to any such testimony by Dr. Gravitz was sustained by Judge Mattingly on the ground that "there is no evidence whatsoever in this case of hypnosis."

At the conclusion of all the evidence, appellant again moved for a judgment of acquittal, arguing that the hypnosis procedure had not been "fully exposed in the evidence." Motions were also made by appellant to strike the boy's testimony and for a mistrial. All motions were denied.[9]

---

**8.** The testimony of the other State's witnesses pertained to nightmares suffered by the boy after the incident and changed personal behavior on the day it was alleged to have occurred, and thereafter.

**9.** The court again said, "I don't know any rule where the court can force the State's Attorney to call a certain witness."

On this appeal, two principal contentions are advanced. The *first* is that the trial judge erred in admitting hypnotically induced testimony. In support of this proposition appellant contends (a) that hypnotically induced testimony is *per se* inadmissible, and (b) that in this case the alleged victim's testimony was hypnotically induced by an unqualified police investigator. The *second* contention is that the court erred in excluding from the jury's consideration evidence that Bobby's testimony had been hypnotically induced. Specifically, appellant argues (a) that the State was improperly permitted, over objection, to call Bobby without "exposing in the evidence" that he had been placed under hypnosis, and (b) that appellant was thereafter improperly prevented from calling his own expert witness in the field of hypnosis. The ultimate result, appellant contends, was to deprive him of a fair trial.

## II

Our opinion in *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 252 Md. 731, *cert. denied,* 395 U.S. 949, 89 S. Ct. 2030, 23 L. Ed. 2d 468 (1969), is the first reported decision concerning the admissibility of hypnotically induced testimony of a prosecuting witness. There, as disclosed in the opinion of the Court by Judge Thompson, the witness was hypnotized by a clinical psychologist in order to refresh her recollection of events which culminated in a brutal sexual attack. Her subsequent testimony at trial consisted of her recollection of those events in the normal waking state. The psychologist testified at length on behalf of the State with respect to hypnosis generally and its use against the appellant. There was no testimony for the defense concerning the reliability of hypnosis in refreshing a witness' recollection. The only objection to the psychologist's testimony related to his qualifications as an expert, primarily that he had not graduated from any school of hypnotism. We held that this objection was properly overruled. With respect to the admissibility of the

testimony of the prosecuting witness, this Court concluded at 5 Md. App. 236, 246 A.2d at 306.

> "The admissibility of Mildred Coley's testimony ... causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide."

*Harding* set the trend for subsequent rulings in other cases dealing with hypnotically induced testimony, that pretrial hypnotism raises questions not of admissibility but of credibility and the weight of the evidence. *E.g., United States v. Adams,* 581 F.2d 193, 198 (9th Cir. 1978), *cert. denied,* 439 U.S. 1006, 99 S. Ct. 621 (1978); [10] *United States v. Narciso,* 446 F. Supp. 252, 284 (E.D. Mich. 1977); *Creamer v. State,* 232 Ga. 136, 138, 205 S.E.2d 240, 242 (1974); *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848, 853 (1979); [11] *State v. Jorgensen,* 8 Or. App. 1, 9, 492 P.2d 312, 315 (1971). *But see Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414 (1974). In some cases, the use of hypnotism was deemed analogous to the use of a document shown to a witness at trial to refresh his or her recollection. *Kline v. Ford Motor Co., Inc.,* 523 F.2d 1067 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir. 1974).

---

**10.** In *Adams* the court expressed its concern that investigatory use of hypnosis on persons who might later be called upon to testify, carries "a dangerous potential for abuse." To insure that statements after hypnotism are the product of the subject's recollections rather than recall tainted by suggestion, it was recommended that there be "complete stenographic records of interviews of hypnotized persons" and that "audio or video" recordings of the interviews would be helpful. 581 F.2d at 199, n. 12.

**11.** In *Smrekar* the court ruled that the testimony of an eyewitness was not rendered inadmissible by her hypnosis prior to making a pretrial identification of the defendant and prior to testimony at trial where (a) the hypnotist was shown to be competent, (b) the evidence disclosed that suggestion was not used in the hypnotic procedure, (c) the identification was corroborated by other evidence, and (d) the evidence showed that the witness had ample opportunity to view him. Some confusion is thus apparent between the issue of admissibility and that of sufficiency.

Ten years after our decision in *Harding*, however, the Court of Appeals of Maryland adopted for the first time the now familiar "general acceptance rule" enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).[12] Under the standard of *Frye,* the Court of Appeals held in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), in an opinion by Judge Eldridge, that "if a new scientific technique's validity is in controversy in the relevant scientific community ... then expert testimony based upon its validity cannot be admitted into evidence." *Id.* at 381, 391 A.2d at 368. Applying this rule in *Reed,* the Court held that testimony based on "voiceprints" or spectrographs is, for the present, inadmissible in this State.

Discussing the question of the reliability generally of scientific techniques, the Court in *Reed* stated:

> "The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. *It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established."* (Emphasis added.)

Continuing, the Court also stated:

> "That is to say, before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field."

12. In *Frye,* it was held that the results of a "deception test," and early version of today's polygraph, were inadmissible.

*Id.* at 381, 391 A.2d at 367-68. It was also pointed out that although *Frye* was a case involving the result of a lie detector examination, the test itself "has been broadly applied, and judged the appropriate standard to apply to newly developed methods of scientific discovery," citing a number of illustrations.

In *Harding,* we did not assess the *Frye* principle, the rule there enunciated not having been applied in this State until *Reed;* [13] nor did we have occasion to probe the question — here directly raised on the authority of *Reed* — of the general acceptability of hypnotism as a reliable technique for memory retrieval within the relevant scientific community. [13A] Two recent decisions of the highest Courts of Minnesota and Arizona have considered this issue, applying the *Frye* test. *Accord, People v. Tait,* 99 Mich. App. 19, 297 N.W.2d 853 (1980).

In *State v. Mack,* 292 N.W.2d 764 (Minn. 1980), the question of the admissibility of hypnotically induced testimony of a witness in a criminal case was certified by a trial court to the Supreme Court of Minnesota. Five experts testified in the proceedings before the trial court on the subject of hypnosis and memory retrieval. As the Supreme Court stated, "[t]he valuable testimony of these expert witnesses provides an extensive record upon which the legal issue before us may be decided." [14]

The *Mack* Court was urged by the defendant to apply the *Frye* rule and to exclude the hypnotically induced testimony of the witness on the ground that her "memory" of the

---

**13.** In *Reed* the Court of Appeals divided four to three. In a vigorous dissenting opinion, Judge Smith stated that the *Frye* test "has never been adopted in Maryland and I am opposed to its adoption."

**13A.** In *State v. Temoney, supra,* the question of *Frye's* applicability was raised but was there limited to expert testimony based upon hypnosis. The *Harding* rule was otherwise reaffirmed.

**14.** The Court also pointed out that examination of the testimony of the expert witnesses underscored the truth of an observation made by one of their members: ". . . a case by case decision on the admissibility question would be prohibitively expensive, and reveals the difficulty of getting experts qualified to testify about hypnosis as an investigative rather than a therapeutic tool."

alleged assault was not sufficiently reliable to merit admission. The State, on the other hand, argued that her testimony was admissible as a refreshed recollection and should be admitted "as long as certain safeguards can be established." Holding the *Frye* rule applicable to hypnosis, the Court observed:

"Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. *Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the Frye rule is equally applicable in this context,* where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation — a filling of gaps with fantasy. Such results are not scientifically reliable as accurate." (Emphasis added.) *Id.,* 292 N.W.2d at 768.

The Minnesota Court rejected the State's argument that *Frye* is inapplicable where the proffered evidence does not consist of the results of a mechanical device, such as a polygraph. The Court's ultimate conclusion was that whether hypnotically induced evidence "is offered by the defense or by the prosecution," a witness whose memory has been "revived" under hypnosis "ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she 'remembered' under hypnosis."

Similarly, the Supreme Court of Arizona applied the *Frye* principle in a very recent criminal appeal and adopted a blanket rule against the admission of testimony that has been refreshed by hypnosis. *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981). Referring to the *Frye* principle, the Arizona Court stated in part:

> "We have said in other cases that *a scientific principle must have gained general acceptance in its field* in order to be accepted by a court as fact. *We believe the same standard should apply to the use of hypnosis to produce testimony by purportedly improving memory."* (Emphasis added.) [15]

*Id.* at    , 624 P.2d at 1279.

*Reed* speaks, of course, of expert testimony based upon the use of a scientific technique. The technique of hypnosis is scientific, but the testimony itself of the witness is the end product of the administration of the technique. The induced recall of the witness is dependent upon, and cannot be disassociated from, the underlying scientific method. Accordingly, we conclude, as did the Minnesota and Arizona Courts, that the *Frye* test must be applied in the instant case, *i.e.,* before Bobby's testimony can be admitted, there must be a determination of whether hypnosis is generally acceptable in the relevant scientific community for the purpose of memory retrieval.

The judgment of conviction of the appellant must therefore be reversed and the case remanded for a new trial. Upon remand, the trial court will be confronted with the necessity of making a determination of the general acceptability *vel non* of hypnosis. The reliability of the technique must be demonstrated before the testimony based upon it can be received. As the Court of Appeals stated in *Reed:*

> "Although this demonstration will normally include testimony by witnesses, a court can and should also take notice of law journal articles,

---

**15.** The Court in *Mena* does not appear to have based its ruling upon expert testimony, as in *Mack,* but upon its own consideration of scientific and other publications on the subject, including particularly a challenging presentation of the thesis that the entire recollection of the witness after hypnosis is unreliable and the procedure renders the witness imcompetent to testify. Diamond, *Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313-49 (1980). The author is a Professor of Law, University of California, Berkeley, and Clinical Professor of Psychiatry, University of California, San Francisco.

articles from reliable sources that appear in scientific journals, and other publications which bear on the degree of acceptance by recognized experts that a particular process has achieved."

*Id.* at 380, 391 A.2d at 367. Specifically, should the court rule under the *Frye* principle that the hypnosis technique is not generally acceptable, Bobby's testimony should not be received, since the boy had no recollection of the alleged incident giving rise to the charges against the appellant *prior* to the hypnosis. *State v. Mena, supra.*

On the other hand, if the court should determine that the requirement of general acceptability in the relevant scientific community is satisfied, it does not follow that the testimony of the alleged victim is for that reason alone admissible. In the case of scientific techniques it is recognized that "if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions, he may refuse to accept such evidence." *State v. Valdez,* 91 Ariz. 274, 371 P.2d 894, 900 (1962); *State v. Steele,* 27 N.C. App. 496, 219 S.E.2d 540, 544 (1975). There are factors bearing upon admissibility in this case which the trial judge should carefully consider: Was the hypnotist professionally qualified to administer hypnosis? If qualified, was he objective in the application of the technique or did he suggest, by leading questions or otherwise, the responses expected to be made by the subject? Was post-hypnotic suggestion employed? Careful concern for the "dangerous potential for abuse" of hypnosis requires that these factors be evaluated by the trial judge in the first instance, as a question of admissibility, rather than by the jury as a matter of the sufficiency of the evidence. *United States v. Adams,* 581 F.2d 193, 198-99 (9th Cir. 1978), *cert. denied,* 439 U.S. 1006 (1978).

Finally, if the use of the technique in the individual case should pass muster and the hypnotically induced testimony be ruled admissible, we think that the fact of the use of hypnosis should be "fully exposed in the evidence," as was done in *Harding.* Indeed, we have found no reported case

where such testimony was admitted and the use of hypnosis was not also revealed to the trier of fact. *E.g. People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848, 855 (1979) ("We rule that the [hypnotically induced testimony] . . . is not rendered inadmissible by her hypnosis . . . where *[inter alia]* (1) the hypnotist was shown to be competent, (2) the evidence indicated that suggestion was not used in the hypnosis. . . ."); *State v. McQueen,* 295 N.C. 96, 119, 244 S.E.2d 414, 427 (1978) ("the jury was fully advised that the witness had been so hypnotized"); *Creamer v. State,* 232 Ga. 136, 138, 205 S.E.2d 240, 242 (1974) ("[t]he fact that [the witness] had been placed under hypnosis by [the psychologist] and the purpose therefor were made clear to the jury)."

We have noted the reluctance of the trial judge, expressed more than once, "to tell the State who to call." In our view, however, it is the duty of the trial judge to require that a jury be informed that the testimony of a witness — whether for the State *or* for the defense — has been hypnotically induced.

> *Judgment reversed; case remanded for a new trial; costs not to be reallocated.*
> *Md. Rule 1082f.*