# WILLIAM HENRY NORWOOD AND PHILLIP EUGENE HOWARD v. STATE OF MARYLAND

[No. 1731, September Term, 1982.]

*Decided July 15, 1983.*

The cause was submitted on briefs to GILBERT, C. J., and LOWE and BLOOM, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Louis P. Willemin, Assistant Public Defender,* for appellants.

Submitted by *Stephen H. Sachs, Attorney General, Anne E. Singleton, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Matthew Campbell, Assistant State's Attorney for Montgomery County,* for appellee.

LOWE, J., delivered the opinion of the Court.

A Montgomery County jury of the peers of William Henry Norwood and Phillip Eugene Howard determined that they had unlawfully entered the apartment of a young woman after she had retired and, from sometime after midnight, took turns raping and ravishing her until nearly dawn. The evidence submitted at trial in the Circuit Court for Montgomery County consisting of various degrees of identification [1] by the victim, testimony placing appellants in the vicinity at the time of the crime, scientific evidence comparing hair samples collected from the victim's apartment and from her person with those of appellants and physical evidence which, coupled with testimonial evidence, gave rise to inferences supporting the direct testimony relating to criminal agency. The corpus delicti of the crimes is not at issue.

---

1. Howard particularly complained that his identification was photographic only and not in-court at all, indicating that such was insufficient to convict. But see Bedford v. State, 293 Md. 172, 185 (1982).

The appellants complain here that the testimony revealed that the victim had been hypnotized prior to having displayed to her photographic arrays from which she identified appellant Howard, and prior to the lineup from which she selected appellant Norwood, whom she also identified at trial as one of her assailants. Appellants jointly complain that any of the victim's testimony relating to identifications following the hypnosis is inadmissible in accordance with our recent holding in *Collins v. State,* 52 Md. App. 186, *cert. granted,* 294 Md. 597 (1982).

Apparently anticipating the State's argument that appellants failed to preserve the issue for appeal by objecting to the testimony on that ground,[2] they contend that because *Collins* postdated their trial they should not be deemed to have waived the objection, citing *Hays and Wainwright v. State,* 240 Md. 482 (1965).

We agree with the State, however, that *Collins* was not the turning point of the change in this Court's opinions from admitting hypnotically induced testimony *(State v. Temoney,* 45 Md. App. 569 (1980); *Harding v. State,* 5 Md. App. 230 (1968)) to precluding it as suspiciously unreliable.

In *Polk v. State,* 48 Md. App. 382 (1981), we very pointedly and in a detailed manner raised the question of scientific reliability suggested by *Reed v. State,* 283 Md. 374 (1978), in which Judge Eldridge announced the Court of Appeals' adoption of the now familiar "general acceptance rule" as enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). That rule, as we noted in *Polk,* clearly warned that "if

---

**2.** All objections to the admission of identification evidence that were made by appellants included specifically articulated grounds therefor, *i.e.,* hearsay, or in Norwood's case, suggestiveness due to a photographic array presented to the victim prior to the lineup identification. "Where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified." Jackson v. State, 288 Md. 191, 196 (1980).

a new scientific technique's validity is in controversy in the relevant scientific community ... then expert testimony based upon its validity cannot be admitted into evidence." *Polk v. State, supra* at 391 (quoting *Reed v. State, supra* at 381).

After carefully explicating the questionable reliability of hypnosis, Judge Moore in *Polk* raised a warning flag prognosticating the *Collins'* conclusions by remanding *Polk* for a "determination of the general acceptability *vel non* of hypnosis". *Id.* at 394. Appellants in the instant case were tried on September 8-16 of 1981. Along with bench and bar, they were clearly forewarned by *Polk,* which was published on April 19, 1981 for that very purpose. Appellants should have objected to any hypnotically induced testimony on the ground that hypnosis had not been shown in that case (or judicially noticed as a matter of law) to have gained general acceptance in the relevant scientific community as a reliable technique of memory retrieval. *Polk* provided authority for an objection based on the absence of evidence to support the required foundation of general scientific acceptance of the technique's reliability. *Collins* merely judicially noticed that such a foundation could not be demonstrated. Because appellants failed to note the objection made available to them by *Polk,* we decline to address the issue. Md. Rule 1085.

Were we not satisfied that the absent objection sufficed as a Rule 1085 waiver, appellant Norwood's complaint of error in the denial of his motion to suppress (heard on September 4, 1981) discloses as to him even more express evidence of a knowing and intended waiver. At the hearing on the motion to suppress the victim's lineup identification of Norwood as predicated upon impermissible suggestion, not only was there an absence of questioning of the officers regarding the hypnosis, but Norwood's attorney specifically indicated that hypnosis had nothing to do with this motion to suppress the victim's lineup identification "per se". His concern was with any suggestibility or influence attempted during that episode, none of which were elicited.

His complaint in this regard is solely predicated here upon the fact that the victim was unable to identify Norwood during her review of an initial array of photographs, but the following month picked Norwood out of a lineup following a long and detailed review and a return look because she had forgotten the number of the assailant she recognized. Although the victim testified that this selection was not based upon her previous viewing of the photographs among which appellant's picture was included but unidentified, Norwood argues that the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, citing *Neil v. Biggers,* 409 U.S. 188, 199 (1972).

Our independent review indicates to us that there was no evidence here of improper suggestion. The victim did not even recall or realize that Norwood's picture had been in one of the three arrays she had reviewed weeks prior to the lineup.[3] To hold that a suspect may not be placed in a lineup or subsequently identified because a victim bypassed his picture previously is outlandish, unless there is some pointedly suggestive circumstance not here present. Even if such circumstance were arguably present, the victim's disclaimer, coupled with her initial opportunity to briefly observe her attacker in clear light, and her prolonged intimate contact with him in a dim dark — but not pitch black — room, certainly provided a source for the in-court identification that is independent of the arguable (if absurdly so) suggestibility in the investigatory procedure. *See Neil v. Biggers, supra,* 409 U.S. at 199-201.

Appellant Howard next has two instances of concern relating solely to himself. One deals with the seizure of evidence not specified in an otherwise valid search warrant; the other relates to testimony describing his attire at the time of his arrest.

---

**3.** Norwood was the only member of the lineup group whose picture had been included in the previous photographic arrays viewed by the victim. In view of the length of time between the two events and the victim's testimony as noted above, we are unpersuaded that this factor rendered the lineup identification impermissibly suggestive.

Following Howard's arrest, a warrant was obtained to search his apartment and to seize, if found, a radio, necklaces, a belt and belt buckle. Those items had been seen by the officer when arresting Howard, and had been verified by description as likely to have been taken from the victim's apartment at and before the time of the rape.

While executing the search, the officer apparently came upon keys which he seized because he had surmised that entrance may have been gained to the victim's apartment by use of a master pass key. He then saw a key blank and

> "I seized the blank key because there may have been the possibility, since he was not supposed to be in possession of a master key per se, that he may have the availability to make a pass key or make a key, and I figured there may be a possibility that's how he got the pass key. He made a key."

Appellant contends that the key's evidentiary significance was not "immediately apparent" to the police as required by *Coolidge v. New Hampshire,* 403 U.S. 443 (1971), for a valid plain view seizure; that the keys and blank were neither "evidentiary" nor were they discovered inadvertently since the officer admitted that he had previously suspected that they might be there.

Appellant is wrong on all counts. The officer's suspicion or belief based simply on his investigative theory would have been insufficient to justify a warrant predicated upon probable cause. Were we to construe "inadvertence" to mean without the slightest suspicion, the plain view doctrine would be nullified in light of the further requirement that the seized item be of apparent evidentiary purpose. *Texas v. Brown,* U.S. , 75 L.Ed.2d 502 (1983), makes it perfectly clear that inadvertence means simply that the officer may not "know" in advance the location of specific evidence and intend to seize it on a "plain view" doctrine pretext. The same case makes it clear that the requirement that the items were "immediately apparent" to be evidentiary simply means that there must be probable cause to associate the items with criminal activity.

Appellant would bind the State in a "catch 22":

> "Assuming *arguendo* that probable cause existed to believe that the keys were evidentiary, the inadvertence requirement of *Coolidge* has not been met. 'Inadvertence' in this context has been equated with an absence of probable cause to believe that the items in question would be on the premises. If the police have probable cause to believe the items are located on the premises, they are obligated to include those items in their request for a warrant."

The short answer to this is simply that appellant confuses his probable causes. Because there had been no signs of forced entry into the locked apartment, the officer had "probable cause" to believe that *a* pass key afforded the unlawful entry and would thus be evidence associated with the crime. His expression of a *belief* that the key or keys would be in Howard's apartment may have been a reasonable suspicion based upon other evidence of Howard's culpability, but it fell short of constituting "probable cause" to obtain a warrant to search for *it* (or them). When upon lawful entry under the warrant the keys appeared in plain view they were, in light of the foregoing circumstances, "probably" those used to gain entrance and were therefore properly seized. *See Texas v. Brown, supra.*

When Howard was arrested he was dressed only in black bikini briefs [4] over pantyhose which he was in the process of rapidly removing while the police were forcing open the door barred by a mattress. This observation by the arresting officers and the lingerie's admissibility was objected to as without relevance. Appellant now argues that such

> ". . . evidence that appellant Howard attired himself in garments customarily worn by a woman has no tendency to support the proposition that he engaged in forcible sexual intercourse with [the victim]."

---

4. One of the officers referred to them as bikini "briefs", the other as bikini "panties".

That evidentiary purpose and its allusion to apparent transvestite tendencies is an inference drawn by appellant for this appeal but unsupported by the record. What appellant avoids, however, is the evidence's relevance to establish the criminal agency of appellant by establishing his possession of pantyhose that "could have been" taken from the victim's room. Her assailants had rummaged through her dressers, etc., and indeed a lingerie drawer of one dresser was expressly noted by an investigating officer describing the disarray.

> "In the - - on the right portion of the room was a chest of drawers with drawers which were open and had lingerie in them. They were standing open."

When shown the pantyhose while testifying the victim identified them as well as could be expected in such circumstance:

> "Q Miss . . . , I'm showing you a bag marked State's Exhibit No. 28 and I'm removing from that bag a pair of pantyhose. I'd like to ask you if those pantyhose look at all familiar to you?
>
> A They could be mine.
>
> Q Do they appear to be the appropriate type of and size of pantyhose that you possessed on March 12th?
>
> A Yes."

Since lingerie is generally owned in multiples rather than singularly, and pantyhose are seldom personalized, such identification clearly indicated the likelihood that the assailants, who had taken other items, may well have taken pantyhose as well. To the extent that appellant argues that the observation of his wearing the pantyhose with black bikini panties, as indicative of transvestitism, was irrelevant to the forced rape, we agree. But we do see the relevance of explaining why a rapist would rummage lingerie drawers and of showing that he might have stolen women's pantyhose.

The weight of testimony and evidence was for the jury but the likelihood of pantyhose theft, and the identification of the item incongruously found on a male person along with black bikini panties, are circumstances from which an inference may be drawn which, considered together with the fact of other objects from the victim's apartment having been found in appellant's apartment, help to establish his criminal agency. It would not have been improper even for the jury to have inferred a similarity of circumstance from the victim's testimony that one of her assailants wore red "bikini" underwear at the time of the assault and the black "bikini" briefs appellant had on over the pantyhose when he was arrested. Had appellant been wearing outer garments similar in unconventional style to those described by the victim as having been worn during the attack, that evidence would have been both probative and relevant. We see no reason why the same rationale is not appropriate regarding undergarments.

*Judgments affirmed.*
*Costs to be paid by appellants.*